**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

**ROSEMARY S. HUNTER,**

**Petitioner,**

**v.**

**ANDREW McGUIRE, et al.**

**Defendants**

**ANDREW McGUIRE, et al.**

**Third Party Plaintiffs,**

**v.**

**FIDELITY MANAGEMENT TRUST CO.,**

**Third Party Defendant.**

**Case No. 26 cv 2167-MLG-SCY**

**AFFIDAVIT OF NICOLE CHAVEZ IN SUPPORT OF**
**FIDELITY MANAGEMENT TRUST COMPANY'S MOTION TO DISMISS/STRIKE**

I, Nicole D. Chavez, declare as follows under penalty of perjury that the following is true and correct:

1. I am an Independent Contractor working for FMR LLC and I am over the age of 18. FMR LLC (hereinafter referred to as "Fidelity") is the parent company of Fidelity Management Trust Company (FMTC). I am familiar with the books and records of Fidelity and FMTC and have personal knowledge of the facts stated herein.

EXHIBIT 3

2. This Affidavit is submitted in support of FMTC's Motion to Strike or Dismiss (Dkt. 27, the "Motion") in the above-captioned case.

3. Fidelity's business records reflect that the Decedent, Eugene McGuire, opened a Rollover Individual Retirement Account in 2010 (the "Decedent's Account").

4. A true and correct copy of the Fidelity IRA Custodial Agreement governing the Decedent's Account that was in effect at or around the time the Decedent's Account was opened[1] (the "Custodial Agreement") is attached hereto as **Exhibit A**.

5. Exhibit A is the same document as Exhibit 2 attached to the Motion.

6. A true and correct copy of the Fidelity Brokerage Retirement Customer Account Agreement ("Customer Agreement") is attached hereto as **Exhibit B**.

7. The Customer Agreement is the contract governing the Decedent's Account that was in effect at or around the time Decedent died and the restrictions were placed on the Decedent's Account in 2026. It is also the same agreement governing the Inherited IRAs opened by Third Party Plaintiffs in 2026. .

8. Exhibit B is the same document as Exhibit 1 attached to the Motion.

9. I am familiar with Fidelity's recordkeeping systems. The Exhibits attached to this affidavit and to the Motion were kept and maintained by Fidelity in the ordinary course of business.

[1] The Custodial Agreement has been amended since the time Decedent's Account was opened. However, the pertinent portions of the Custodial Agreement cited in Defendant's Motion are the same in the original and amended Custodial Agreement.

I declare under penalty of perjury of the laws of the United State that the foregoing is true and correct.

EXECUTED this 8th day of October 2026
at Clarksville, Tennessee

Nicole D. Chavez

# Fidelity IRA

Fidelity Individual Retirement Account
Under Section 408(a) of the Internal Revenue Code

The Depositor whose name appears on the accompanying Application is establishing a traditional individual retirement account (under Section 408(a) of the Internal Revenue Code) to provide for his or her retirement and for the support of his or her beneficiaries after death. The Custodian named on the accompanying Application has given the Depositor the Disclosure Statement required under the Income Tax Regulations under Section 1.408-6. The Depositor has deposited with the Custodian an initial contribution in cash, as set forth in the accompanying Application. The Depositor and the Custodian make the following Agreement:

## Article I

Except in the case of a rollover contribution described in section 402(c), 403(a)(4), 403(b)(8), 408(d)(3), or 457(e)(16), an employer contribution to a simplified employee pension plan as described in section 408(k), or a recharacterized contribution described in section 408A(d)(6), the Custodian will accept only cash contributions up to $3,000 per year for tax years 2002 through 2004. That contribution limit is increased to $4,000 for tax years 2005 through 2007 and $5,000 for 2008 and thereafter. For individuals who have reached the age of 50 before the close of the tax year, the contribution limit is increased to $3,500 per year for tax years 2002 through 2004, $4,500 for 2005, $5,000 for 2006 and 2007, and $6,000 for 2008 and thereafter. For
tax years after 2008, the above limits will be increased to reflect a cost-of-living adjustment, if any.

## Article II

The Depositor's interest in the balance in the Custodial Account is nonforfeitable.

## Article III

**1.** No part of the Custodial Account funds may be invested in life insurance contracts, nor may the assets of the Custodial Account be commingled with other property except in a common trust fund or common investment fund (within the meaning of section 408(a)(5)).
**2.** No part of the Custodial Account funds may be invested in collectibles (within the meaning of section 408(m)) except as otherwise permitted by section 408(m)(3), which provides an exception for certain gold, silver, and platinum coins, coins issued under the laws of any state, and certain bullion.

## Article IV

**1.** Notwithstanding any provision of this agreement to the contrary, the distribution of the Depositor's interest in the Custodial Account shall be made in accordance with the following requirements and shall otherwise comply with section 408(a)(6) and the regulations thereunder, the provisions of which are herein incorporated by reference.
**2.** The Depositor's entire interest in the Custodial Account must be, or begin to be, distributed not later than the Depositor's required beginning date, April 1 following the calendar year in which the Depositor reaches age 70½. By that date, the Depositor may elect, in a manner acceptable to the Custodian, to have the balance in the Custodial Account distributed in:
(a) A single sum or
(b) Payments over a period not longer than the life of the Depositor or the joint lives of the Depositor and his or her designated beneficiary.
**3.** If the Depositor dies before his or her entire interest is distributed to him or her, the remaining interest will be distributed as follows:
(a) If the Depositor dies on or after the required beginning date and:
 (i) the designated beneficiary is the Depositor's surviving spouse, the remaining interest will be distributed over the surviving spouse's life expectancy as determined each year until such spouse's death, or over the period in paragraph (a)(iii) below if longer. Any interest remaining after the spouse's death will be distributed over such spouse's remaining life expectancy as determined in the year of the spouse's death and reduced by 1 for each subsequent year, or, if distributions are being made over the period in paragraph (a)(iii) below, over such period.
 (ii) the designated beneficiary is not the Depositor's surviving spouse, the remaining interest will be distributed over the beneficiary's remaining life expectancy as determined in the year following the death of the Depositor and reduced by 1 for each subsequent year, or over the period in paragraph (a)(iii) below if longer.
 (iii) there is no designated beneficiary, the remaining interest will be distributed over the remaining life expectancy of the Depositor as determined in the year of the Depositor's death and reduced by 1 for each subsequent year.
(b) If the Depositor dies before the required beginning date, the remaining interest will be distributed in accordance with (i) below or, if elected or there is no designated beneficiary, in accordance with (ii) below:
 (i) The remaining interest will be distributed in accordance with paragraphs (a)(i) and (a)(ii) above (but not over the period in paragraph (a)(iii), even if longer), starting by the end of the calendar year following the year of the Depositor's death. If, however, the designated beneficiary is the Depositor's surviving spouse, then this distribution is not required to begin before the end of the calendar year in which the Depositor would have reached age 70½. But, in such case, if the Depositor's surviving spouse dies before distributions are required to begin, then the remaining interest will be distributed in accordance with (a)(ii) above (but not over the period in paragraph (a)(iii), even if longer), over such spouse's designated beneficiary's life expectancy, or in accordance with (ii) below if there is no such designated beneficiary.
 (ii) The remaining interest will be distributed by the end of the calendar year containing the fifth anniversary of the Depositor's death.
**4.** If the Depositor dies before his or her entire interest has been distributed and if the designated beneficiary is not the Depositor's surviving spouse, no additional contributions may be accepted in the Account.
**5.** The minimum amount that must be distributed each year, beginning with the year containing the Depositor's required beginning date, is known as the "required minimum distribution" and is determined as follows:
(a) The required minimum distribution under paragraph 2(b) for any year, beginning with the year the Depositor reaches age 70½, is the Depositor's Account value at the close of business on December 31 of the preceding year divided by the distribution period in the uniform lifetime table in Regulations section 1.401(a)(9)-9. However, if the Depositor's designated beneficiary is his or her surviving spouse, the required minimum distribution for a year shall not be more than the Depositor's Account value at the close of business on December 31 of the preceding year divided by the number in the joint and last survivor table in Regulations section 1.401(a)(9)-9. The required minimum distribution for a year under this paragraph (a) is determined using the Depositor's (or, if applicable, the Depositor
and spouse's) attained age (or ages) in the year.
(b) The required minimum distribution under paragraphs 3(a) and 3(b)(i) for a year, beginning with the year following the year of the Depositor's death (or the year the Depositor would have reached age 70½, if applicable under paragraph 3(b)(i)) is the Account value at the close of business on December 31 of the preceding year divided by the life expectancy (in the single life table in Regulations section 1.401(a)(9)-9) of the individual specified in such paragraphs 3(a) and 3(b)(i).
(c) The required minimum distribution for the year the Depositor reaches age 70½ can be made as late as April 1 of the following year. The required minimum distribution for any other year must be made by the end of such year.
**6.** The owner of two or more traditional IRAs may satisfy the minimum distribution requirements described above by taking from one traditional IRA the amount required to satisfy the requirement for another in accordance with the regulations under section 408(a)(6).

## Article V

**1.** The Depositor agrees to provide the Custodian with all information necessary to prepare any reports required by section 408(i) and Regulations sections 1.408-5 and 1.408-6.

EXHIBIT A

**2.** The Custodian agrees to submit to the Internal Revenue Service (IRS) and Depositor the reports prescribed by the IRS.

## Article VI

Notwithstanding any other articles which may be added or incorporated, the provisions of Articles I through III and this sentence will be controlling. Any additional articles inconsistent with section 408(a) and the related regulations will be invalid.

## Article VII

This agreement will be amended as necessary to comply with the provisions of the Code and the related regulations. Other amendments may be made with the consent of the Depositor and the Custodian.

## Article VIII

**1.** Definitions. The following definitions shall apply to terms used in this Agreement:

(a) "Account" or "Custodial Account" means the custodial account established hereunder for the benefit of the Depositor (or following the death of the Depositor, the Beneficiary).

(b) "Agreement" means the Fidelity IRA Custodial Agreement and Disclosure Statement, including the information and provisions set forth in any Application that goes with this Agreement, as may be amended from time to time. This Agreement, including the Account Application and any designation of Beneficiary filed with the Custodian, may be proved either by an original copy or by a reproduced copy thereof, including, without limitation, a copy reproduced by photocopying, facsimile transmission, electronic record or electronic imaging.

(c) "Account Application" or "Application" shall mean the Application and the accompanying instructions, as may be amended from time to time, by which this Agreement is established between the Depositor (or following the death of the Depositor, the Beneficiary) and the Custodian. The statements contained therein shall be incorporated into this Agreement.

(d) "Authorized Agent" means the person or persons authorized by the Depositor (or following the death of the Depositor, the Beneficiary) in a form and manner acceptable to the Custodian to purchase or sell Shares or Other Funding Vehicles in the Depositor's (or following the death of the Depositor, the Beneficiary's) Account and to perform the duties and responsibilities on behalf of the Depositor (or following the death of the Depositor, the Beneficiary) as set forth under this Agreement. The Custodian shall have no duty to question the authority of any such Authorized Agent.

(e) "Beneficiary" shall mean the person(s) or entity (including a trust or estate, in which case the term may mean the trustee or personal representative acting in their fiduciary capacity) designated as such by the Depositor (or, following the death of the Depositor, designated as such by a Beneficiary) (i) in a manner acceptable to and filed with the Custodian pursuant to Article VIII, Section 7 of this Agreement, or (ii) pursuant to the default provisions of Article VIII, Section 7 of this Agreement.

(f) "Code" shall mean the Internal Revenue Code of 1986, as amended.

(g) "Company" shall mean FMR LLC, a Delaware corporation, or any successor or affiliate thereof to which FMR LLC may, from time to time, delegate or assign any or all of its rights or responsibilities under this Agreement.

(h) "Conversion Amount" shall mean all or any part of a distribution from an IRA other than a Roth IRA (including a SEP IRA, SARSEP IRA, or a SIMPLE IRA) deposited in a Roth IRA.

(i) "Custodian" shall mean Fidelity Management Trust Company or its successor(s) or affiliates. Custodian shall include any agent of the Custodian as duly appointed by the Custodian.

(j) "Depositor" means the person named in the Account Application establishing an Account for the purpose of making contributions to an individual retirement account as provided for under the Code. This term shall not include a Beneficiary who establishes an Account with the Custodian after the death of the Depositor.

(k) "Investment Company Shares" or "Shares" shall mean shares of stock, trust certificates, or other evidences of interest (including fractional shares) in any corporation, partnership, trust, or other entity registered under the Investment Company Act of 1940 for which Fidelity Management & Research Company, a Massachusetts corporation, or its successors or affiliates (collectively, for purposes of this Agreement "FMR") serves as investment advisor.

(l) "Money Market Shares" shall mean any Investment Company Shares which are issued by a money market mutual fund.

(m) "Other Funding Vehicles" shall include (i) all marketable securities traded over the counter or on a recognized securities exchange which are eligible for registration on the book entry system maintained by the Depository Guaranty Trust Company ("DTC") or its successors; (ii) if permitted by the Custodian, including interest bearing accounts, and (iii) such other non-DTC eligible assets (but not including futures contracts) which are permitted to be acquired under a custodial account pursuant to Section 408(a) of the Code and which are acceptable to the Custodian. Notwithstanding the above, the Custodian reserves the right to refuse to accept and hold any specific asset. All assets of the Custodial Account shall be registered in the name of the Custodian or its nominee, but such assets shall generally be held in an Account for which the records are maintained on a proprietary recordkeeping system of the Company.

**2. Investment of Contributions.** Contributions to the Account may only be invested in Investment Company Shares and Other Funding Vehicles. The Custodian reserves the right to refuse to accept and hold any specific asset, including tax-free investment vehicles. Contributions shall be invested as follows:

(a) *General.* Contributions (including transfers of assets) will be invested in accordance with the Depositor's (the Authorized Agent's or, following the death of the Depositor, the Beneficiary's) instructions in the Application, or as the Depositor (the Authorized Agent, or following the death of the Depositor, the Beneficiary) directs in a form and manner acceptable to the Custodian, and with subsequent instructions given by the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary), as the case may be to the Custodian in a form and manner acceptable to the Custodian. By giving such instructions to the Custodian, such person will be deemed to have acknowledged receipt of the then-current prospectus or disclosure document for any Investment Company Shares or Other Funding Vehicles in which the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) directs the Custodian to invest assets in the Account. All charges incidental to carrying out such instructions shall be charged and collected in accordance with Article VIII, Section 18.

(b) *Initial Contribution.* The Custodian will invest all contributions (including transfers of assets) promptly after the receipt thereof. However, the Custodian shall not be obligated to invest the Depositor's initial contribution (or the Beneficiary's initial transfer of assets) to this Custodial Account as indicated on the Application, until at least seven (7) calendar days have elapsed from the date of acceptance of the Application by or on behalf of the Custodian. The Depositor (or following the death of the Depositor, the Beneficiary) shall be deemed to have received a copy of the Disclosure Statement which accompanies this Agreement unless a request for revocation is made to the Custodian within seven (7) calendar days following the acceptance of the Application by or on behalf of the Custodian as evidenced by notification to the Depositor (or following the death of the Depositor, the Beneficiary) in a form and manner acceptable to the Custodian.

(c) *Incomplete, Unclear or Unacceptable Instructions.* If the Custodial Account at any time contains an amount as to which investment instructions in accordance with this Section 2 have not been received by the Custodian, or if the Custodian receives instructions as to investment selection or allocation which are, in the opinion of the Custodian, incomplete, not clear or otherwise not acceptable, the Custodian may request additional instructions from the Depositor (the Authorized Agent or the Beneficiary). Pending receipt of such instructions any amount may (i) remain uninvested pending receipt by the Custodian of clear investment instructions from the Depositor (the Authorized Agent or the Beneficiary), (ii) be invested in Money Market Shares or other core account investment vehicle, or (iii) be returned to the Depositor (or following the death of the Depositor, the Beneficiary) as the case may be, and any other investment may remain unchanged. The Custodian shall not be liable to anyone for any loss resulting from delay in investing such amount or in implementing such instructions. Notwithstanding the above, the Custodian may, but need not, for administrative convenience maintain a balance of up to $100 of uninvested cash in the Custodial Account.

(d) *Minimum Investment.* Any other provision herein to the contrary notwithstanding, the Depositor (the Authorized Agent or the Beneficiary) may not direct that any part or all of the Custodial Account be invested in Investment Company Shares or Other Funding Vehicles unless the aggregate amount to be invested is at least such amount as the Custodian shall establish from time to time.

(e) *No Duty.* The Custodian shall not have any duty to question the directions of the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) in the investment or ongoing management of the Custodial Account or to advise the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) regarding the purchase, retention, withdrawal, or sale of assets credited to the Custodial Account. The Custodian, or any of its affiliates, successors, agents or assigns, shall not be liable for any loss which results from the Depositor's (the Authorized Agent's or the Beneficiary's) exercise of control (whether by his or her action or inaction) over the Custodial Account, or any loss which results from any directions received from the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) with respect to IRA assets.

**3. Contributions by Divorced or Separated Spouses.** All alimony and separate maintenance payments received by a divorced or separated spouse, and taxable under Section 71 of the Code, shall be considered compensation for purposes of computing the maximum annual contri-

bution to the Custodial Account, and the limitations for contributions by a divorced or separated spouse shall be the same as for any other individual.

**4. Contribution Deadlines.** The following contribution deadlines generally apply to certain transactions within your IRA.

(a) *Contributions.* The last day to make annual contributions (including catch-up contributions) for a particular tax year is the deadline for filing the Depositor's federal income tax return (not including extensions), or such later date as may be determined by the Department of the Treasury or the Internal Revenue Service for the taxable year for which the contribution relates; provided, however, the Depositor (or the Depositor's Authorized Agent) designates, in a form and manner acceptable to the Custodian, the contribution as a contribution for such taxable year.

(b) *Recharacterizations.* A contribution that constitutes a recharacterization of a prior IRA or Roth IRA contribution for a particular tax year must be made by the deadline for filing the Depositor's income tax return (including extensions) for such tax year or such later date as authorized by the IRS.

The Custodian will not be responsible under any circumstances for the timing, purpose or propriety of any contribution nor shall the Custodian incur any liability for any tax, penalty, or loss imposed on account of any contribution.

**5. Rollover Contributions.** The Custodian will accept for the Depositor's Custodial Account in a form and manner acceptable to the Custodian all rollover contributions which consist of cash, and it may, but shall be under no obligation to, accept all or any part of any other property permitted as an investment under Code Section 408. The Depositor (or the Depositor's Authorized Agent) shall designate in a form and manner acceptable to the Custodian each rollover contribution as such to the Custodian, and by such designation shall confirm to the Custodian that a proposed rollover contribution qualifies as a rollover contribution within the meaning of Sections 402(c), 403(a)(4), 403(b)(8), 408(d)(3), and/or 457(e)(16) of the Code. The Depositor (or the Depositor's Authorized Agent) shall provide any information the Custodian may require to properly allocate rollover contributions to the Depositor's Account(s). Submission by or on behalf of a Depositor of a rollover contribution consisting of assets other than cash or property permitted as an investment under this Article VIII shall be deemed to be the instruction of the Depositor to the Custodian that, if such rollover contribution is accepted, the Custodian will use its best efforts to sell those assets for the Depositor's Account, and to invest the proceeds of any such sale in accordance with Section 2. The Custodian shall not be liable to anyone for any loss resulting from such sale or delay in effecting such sale; or for any loss of income or appreciation with respect to the proceeds thereof after such sale and prior to investment pursuant to Section 2; or for any failure to effect such sale if such property proves not readily marketable in the ordinary course of business. All brokerage and other costs incidental to the sale or attempted sale of such property will be charged to the Custodial Account in accordance with Article VIII, Section 18. The Custodian will not be responsible for any losses the Depositor may incur as a result of the timing of any rollover from another trustee or custodian that is due to circumstances reasonably beyond the control of the Custodian. It shall be the Depositor's responsibility to ensure that any minimum distribution required by sections 408(a)(6) and 401(a)(9) of the Code and applicable regulations is made prior to giving the Custodian such rollover instructions.

**6. Reinvestment of Earnings.** In the absence of other instructions pursuant to Section 2, distributions of every nature received in respect of the assets in a Depositor's (or following the death of the Depositor, the Beneficiary's) Custodial Account shall be reinvested as follows:

(a) in the case of a distribution in respect of Investment Company Shares which may be received, at the election of the shareholder, in cash or in additional Shares of an Investment Company, the Custodian shall elect to receive such distribution in additional Investment Company Shares;

(b) in the case of a cash distribution which is received in respect of Investment Company Shares, the Custodian shall reinvest such cash in additional Shares of that Investment Company;

(c) in the case of any other distribution of any nature received in respect of assets in the Custodial Account, the distribution shall be liquidated to cash, if necessary, and shall be reinvested in accordance with the Depositor's (the Authorized Agent's, or following the death of the Depositor, the Beneficiary's) instructions pursuant to Section 2.

**7. Designation of Beneficiary.**

A Depositor may designate a Beneficiary for his or her Account as follows:

(a) *General.* A Depositor (or following the death of the Depositor, the Beneficiary) may designate a Beneficiary or Beneficiaries at any time, and any such designation may be changed or revoked at any time, by a designation executed by the Depositor (or following the death of the Depositor, the Beneficiary) in a form and manner acceptable to, and filed with, the Custodian; provided, however, that such designation, or change or revocation of a prior designation, shall not be effective unless it is received and accepted by the Custodian no later than nine months after the death of the Depositor (or following the death of the Depositor, the Beneficiary), and provided, further, that such designation, change or revocation shall not be effective as to any assets distributed or transferred out of the Account (including a transfer to an inherited IRA or Beneficiary Distribution Account) prior to the Custodian's receipt and acceptance of such designation, change, or revocation. Subject to Sections 9 and 10 below, the Custodian may distribute or transfer any portion of the Account immediately following the death of the Depositor (or following the death of the Depositor, the Beneficiary) under the provisions of the designation then on file with the Custodian, and such distribution or transfer discharges the Custodian from any and all claims as to the portion of the Account so distributed or transferred. The latest such designation or change or revocation shall control except as determined by applicable law. If the Depositor had not by the date of his or her death properly designated a Beneficiary in accordance with the preceding sentence, or if no designated primary or contingent Beneficiary survives the Depositor, the Depositor's Beneficiary shall be his or her surviving spouse, but if he or she has no surviving spouse, his or her estate. If the Depositor designates more than one primary or contingent Beneficiary but does not specify the percentages to which such Beneficiary(ies) is entitled, payment will be made to the surviving Beneficiary(ies),
as applicable, in equal shares. Unless otherwise designated by the Depositor in a form and manner acceptable to the Custodian, if a primary or contingent Beneficiary designated by the Depositor predeceases the Depositor, the Shares and Other Funding Vehicles for which that deceased Beneficiary is entitled will be divided equally among the surviving primary and contingent Beneficiary(ies), as applicable. If the Beneficiary is not a U.S. citizen or other U.S. person (including a resident alien individual) at the time of the Depositor's death, the distribution options and tax treatment available to such Beneficiary may be more restrictive. Unless otherwise designated by the Depositor in a form and manner acceptable to the Custodian, if there are no primary Beneficiaries living at the time of the Depositor's death, payment of the Depositor's Account upon his or her death will be made to the surviving contingent Beneficiaries designated by the Depositor. If a Beneficiary does not predecease the Depositor but dies before receiving his or her entire interest in the Custodial Account, his or her remaining interest in the Custodial Account shall be paid to a Beneficiary or Beneficiaries designated by such Beneficiary(ies) as his or her successor Beneficiary in a form and manner acceptable to, and filed with, the Custodian; provided, however, that such designation must be received and accepted by the Custodian in accordance with this section. If no proper designation has been made by such Beneficiary in accordance with this section, distributions will be made to such Beneficiary's estate. Notwithstanding any provision of this Agreement to the contrary, for purposes of distributions calculated and requested pursuant to Article IV, the designated beneficiary within the meaning of Section 401(a)(9)(E) of the Code shall be the individual designated as such by the Depositor. Notwithstanding any provision of this Agreement to the contrary, unless otherwise designated by the Depositor (or following the death of the Depositor, by a Beneficiary) in a form and manner acceptable to the Custodian, when used in this Agreement or in any designation of Beneficiary received and accepted by the Custodian, the term "per stirpes" shall be construed as follows: if any primary or contingent Beneficiary, as applicable, does not survive the Depositor (or following the death of the Depositor, the Beneficiary), but leaves surviving descendants, any share otherwise payable to such beneficiary shall instead be paid to such beneficiary's surviving descendants by right of representation. In all cases, the Custodian shall be authorized to rely on any representation of facts made by the Depositor, the executor or administrator of the estate of the Depositor, any Beneficiary, the executor or administrator of the estate of any Beneficiary, or any other person deemed appropriate by the Custodian in determining the identity of unnamed Beneficiaries.

(b) *Minors.* If a distribution upon the death of the Depositor (or following the death of the Depositor, the Beneficiary) is payable to a person known by the Custodian to be a minor or otherwise under a legal disability, the Custodian may, in its absolute discretion, make all, or any part of the distribution to (i) a parent of such person, (ii) the guardian, conservator, or other legal representative, wherever appointed, of such person, (iii) a custodial account established under a Uniform Gifts to Minors Act, Uniform Transfers to Minors Act, or similar act, (iv) any person having control or custody of such person, or (v) to such person directly. Notwithstanding anything in this Agreement to the contrary, if the Account is established for a minor under the provisions of either the Uniform Gifts to Minors Act or the Uniform Transfers to Minors Act (to the extent permitted by the Custodian), the beneficiary of such Account while so established and maintained shall be the minor's estate or as otherwise determined in accordance with the applicable state Uniform Gifts to Minors Act or Uniform Transfers to Minors Act.

(c) *QTIPs and QDOTs.* A Depositor (or following the death of the Depositor, the Beneficiary) may designate as Beneficiary of his or her Account a trust for the benefit of his or her surviving spouse that is intended to satisfy the conditions of Sections 2056(b)(7) or 2056A of the Code (a "Spousal Trust"). In that event, if the Depositor (or, following the death of the Depositor, the Beneficiary) is survived by his or her spouse, the following provisions shall apply to the Account, from and after the

death of the Depositor (or following the death of the Depositor, the Beneficiary) until the death of the Depositor's (or following the death of the Depositor, the Beneficiary's) surviving spouse: (i) all of the income of the Account shall, at the direction of the trustee(s) of the Spousal Trust, be paid to the Spousal Trust annually or at more frequent intervals, and (ii) no person shall have the power to appoint any part of the Account to any person other than the Spousal Trust. To the extent permitted by Section 401(a)(9) of the Code, as determined by the trustee(s) of the Spousal Trust, the surviving spouse of a Depositor who has designated a Spousal Trust as his or her Beneficiary may be treated as his or her "designated beneficiary" for purposes of the distribution requirements of that Code section. The Custodian shall have no responsibility to determine whether such treatment is appropriate.

(d) *Judicial Determination.* Anything to the contrary herein notwithstanding, in the event of reasonable doubt respecting the proper course of action to be taken, the Custodian may in its sole and absolute discretion resolve such doubt by judicial determination which shall be binding on all parties claiming any interest in the Account. In such event all court costs, legal expenses, reasonable compensation of time expended by the Custodian in the performance of its duties, and other appropriate and pertinent expenses and costs shall be collected by the Custodian from the Custodial Account in accordance with Article VIII, Section 18.

(e) *No Duty.* The Custodian shall not have any duty to question the directions of a Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) as to the time(s) and amount(s) of distributions from the Custodial Account, or to advise him or her regarding the compliance of such distributions with Section 408(a)(6), Section 401(a)(9), Section 2056(b)(7) or Section 2056A of the Code.

**8. Payroll Deduction.** Subject to approval of the Custodian, a Depositor may choose to have contributions to his or her Custodial Account made through payroll deduction if the Account is maintained as part of a program or plan sponsored by the Depositor's employer, or if the employer otherwise agrees to provide such service. In order to establish payroll deduction, the Depositor must authorize his or her employer to deduct a fixed amount or percentage from each pay period's salary up to the maximum annual IRA contribution limit per year, unless such contributions are being made pursuant to a Simplified Employee Pension Plan described under Section 408(k) of the Code, in which case, contributions can be made up to the maximum annual percentage limit of the Depositor's earned compensation (subject to the contribution limits as described in Section 402(h)(2) and the compensation limits as described in Section 401(a)(17), 404(l) and 408(k) of the Code). Contributions to a Custodial Account of the Depositor's spouse may be made through payroll deduction if the employer authorizes the use of payroll deductions for such contributions, but such contributions must be made to a separate Account maintained for the benefit of the Depositor's spouse. The Custodian shall continue to receive for the Depositor's Account payroll deduction contributions until such time as the Depositor's instruction to his or her employer (with reasonable advance notice) causes such contributions to be modified or to cease.

**9. Transfers to or from the Account.** Assets held on behalf of the Depositor (or following the death of the Depositor, the Beneficiary) in another IRA may be transferred by the trustee or custodian thereof directly to the Custodian, in a form and manner acceptable to the Custodian, to be held in the Custodial Account for the Depositor (or following the death of the Depositor, the Beneficiary) under this Agreement. The Custodian will not be responsible for any losses the Depositor (or following the death of the Depositor, the Beneficiary) may incur as a result of the timing of any transfer from another trustee or custodian that are due to circumstances reasonably beyond the control of the Custodian. The Depositor (or following the death of the Depositor, the Beneficiary) shall be responsible for ensuring that any transfer of another IRA by the trustee or custodian thereof directly to the Custodian is in compliance with the terms and conditions of the instrument governing the IRA of the transferor trustee or custodian, the Code and any related rules, regulations and guidance issued by the Internal Revenue Service.

Assets held on behalf of the Depositor (or following the death of the Depositor, the Beneficiary) in the Account may be transferred directly to a trustee or custodian of another IRA established for the Depositor (or following the death of the Depositor, the Beneficiary), if so directed by the Depositor (or following the death of the Depositor, the Beneficiary) in a form and manner acceptable to the Custodian; provided, however, that it shall be the Depositor's (or following the death of the Depositor, the Beneficiary's) responsibility to ensure that the transfer is permissible and any minimum distributions required by Sections 408(a)(6) and 401(a)(9) of the Code and applicable regulations is satisfied.

**10. Distributions from the Account.** Distributions from the Account will be made only upon the request of the Depositor (or, with the prior consent of the Custodian, the Authorized Agent, or, following the death of the Depositor, the Beneficiary) to the Custodian in such form and in such manner as is acceptable to the Custodian, and will generally be included in the gross income of the recipient to the extent required by law. Notwithstanding this Section 10 and Section 17 below, the Custodian is empowered to make distributions absent the Depositor's (the Authorized Agent or after the death of the Depositor, the Beneficiary) direction if directed to do so pursuant to a court order or levy of any kind, or in the event the Custodian resigns or is removed as Custodian. In such instance, neither the Custodian nor the Company shall in any event incur any liability for acting in accordance with such court order or levy, or with the procedures for resignation or removal in Section 24 below. For distributions requested pursuant to Article IV, life expectancy shall be calculated based on information provided by the Depositor (or with the prior consent of the Custodian, the Authorized Agent or, following the death of the Depositor, the Beneficiary) using any applicable distribution period from tables prescribed by the IRS in regulations or other guidance. The Custodian shall be under no duty to perform any calculations in connection with distributions requested pursuant to Article IV, unless specifically required to by the IRS. Notwithstanding the foregoing, at the direction of the Depositor (or following the death of the Depositor, the Beneficiary), and with the consent of the Custodian, the Custodian may perform calculations in connection with such distributions. The Custodian shall not incur any liability for errors in any such calculations as a result of reliance on information provided by the Depositor (or with the prior consent of the Custodian, the Authorized Agent or, following the death of the Depositor, the Beneficiary). Without limiting the generality of the foregoing, the Custodian is not obligated to make any distribution, including a minimum required distribution as specified in Article IV above, absent a specific direction from the Depositor (or with the prior consent of the Custodian, the Authorized Agent or, following the death of the Depositor, the Beneficiary) to do so in a form and manner acceptable to the Custodian, and the Custodian may rely, and shall be fully protected in so relying, upon any such direction. The Custodian will not, under any circumstances, be responsible for the timing, purpose or propriety of any distribution made hereunder, nor shall the Custodian incur any liability or responsibility for any tax or penalty imposed on account of any distribution or failure to make a required distribution. Notwithstanding anything herein to the contrary,

on or before December 31, 2003, a Beneficiary receiving distributions pursuant to Paragraph 3(b)(ii) of Article IV of this Custodial Agreement may generally begin taking distributions over the Beneficiary's remaining life expectancy in accordance with Section 401(a)(9) of the Code and related regulations.

**11. Conversion of Distributions from the Account.** Generally, the Depositor may convert any or all distributions from the Account, for deposit into a Roth IRA ("Conversion Amount(s)"). However, any minimum distribution from the Account required by Sections 408(a)(6) and 401(a)(9) of the Code and applicable regulations for the year of the conversion cannot be converted to a Roth IRA. The Depositor (or the Depositor's Authorized Agent) shall designate in a form and manner acceptable to the Custodian each Conversion Amount as such to the Custodian and by such designation shall confirm to the Custodian that a proposed Conversion Amount qualifies as a conversion within the meaning of Sections 408A(c)(3), 408A(d)(3) and 408A(e) of the Code, except that any conversion contribution shall not be considered a rollover contribution for purposes of Section 408(d)(3)(B) of the Code relating to the one rollover per year rule. Conversions must generally be made by December 31 of the year to which the conversion relates. Conversions made via a 60-day rollover must be deposited in a Roth IRA within 60 days.

**12. Recharacterization of Contributions.** Annual contributions or conversion contributions held on behalf of the Depositor in a Roth IRA may be transferred ("recharacterized") via a trustee-to-trustee transfer to the Custodian, in a form and manner acceptable to the Custodian, to be held in the Custodial Account for the Depositor under this Agreement. The Custodian will not be responsible for any penalties or losses the Depositor may incur as a result of the timing of any such recharacterization from another trustee or custodian that are due to circumstances reasonably beyond the control of the Custodian.

Annual contributions held on behalf of the Depositor in the Account may be transferred ("recharacterized") via a trustee-to-trustee transfer to a trustee or custodian of a Roth IRA established for the Depositor, if so directed by the Depositor (or the Depositor's Authorized Agent) in a form and manner acceptable to the Custodian. It shall be the Depositor's responsibility in all cases to ensure that the recharacterization is permissible and satisfies the requirements of Code Section 408A and any related regulations, and any other applicable guidance issued by the Internal Revenue Service.

A contribution that constitutes a recharacterization of a prior contribution or conversion must be made by the deadline for filing the Depositor's income tax return for the year the contribution or conversion, as applicable, relates or such later date as authorized by the IRS.

**13. Actions in the Absence of Specific Instructions.** If the Custodian receives no response to communications sent to the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) at the Depositor's (the Authorized Agent or following the death of the Depositor, the Beneficiary's) last known address as shown in the records of the Custodian, or if the Custodian determines, on the basis of evidence satisfactory to it, that the Depositor (or following the death of the Depositor, the Beneficiary) is legally

incompetent, the Custodian thereafter may make such determinations with respect to distributions, investments, and other administrative matters arising under this Agreement as it considers reasonable, notwithstanding any prior instructions or directions given by or on behalf of the Depositor (or following the death of the Depositor, the Beneficiary). Any determinations so made shall be binding on all persons having or claiming any interest under the Custodial Account, and the Custodian shall not incur any obligation or liability for any such determination made in good faith, for any action taken in pursuance thereof, or for any fluctuations in the value of the Account in the event of a delay resulting from the Custodian's good faith decision to await additional information or evidence.

**14. Instructions, Notices, and Communications.** All instructions, notices or communications, written or otherwise, required to be given by the Custodian to the Depositor (or following the death of the Depositor, the Beneficiary) shall be deemed to have been given when delivered or provided to the last known address, including an electronic address of the Depositor or the Beneficiary in the records of the Custodian. All instructions, notices, or communications, written or otherwise, required to be given by the Depositor (or following the death of the Depositor, the Beneficiary) to the Custodian shall be mailed, delivered or provided to the Custodian at its designated mailing address, including an electronic address if authorized by the Custodian, as specified on the Application or Account statement (or such other address as the Custodian may specify), and no such instruction, notice, or communication shall be effective until the Custodian's actual receipt thereof.

**15. Effect of Instructions, Notices, and Communications.**

(a) *General.* The Custodian shall be entitled to rely conclusively upon, and shall be fully protected in any action or non-action taken in good faith in reliance upon, any instructions, notices, communications or instruments, written or otherwise, believed to have been genuine and properly executed. Any such notification may be proved by original copy or reproduced copy thereof, including, without limitation, a copy produced by photocopying, facsimile transmission, electronic record or electronic imaging. For purposes of this Agreement, the Custodian may (but is not required to) give the same effect to a telephonic instruction or an instruction received through electronic commerce as it gives to a written instruction, and the Custodian's action in doing so shall be protected to the same extent as if such telephonic or electronic commerce instructions were, in fact, a written instruction. Any such instruction may be proved by audio recorded tape, data file or electronic record maintained by the Custodian, or other means acceptable to the Custodian, as the case may be.

(b) *Incomplete or Unclear Instructions.* If the Custodian receives instructions or other information relating to the Depositor's (or following the death of the Depositor, the Beneficiary's) Custodial Account which are, in the opinion of the Custodian, incomplete or not clear, the Custodian may request instructions or other information from the Depositor (the Authorized Agent, or following the death of the Depositor, the Beneficiary). Pending receipt of any such instructions or other information, the Custodian shall not be liable to anyone for any loss resulting from any delay, action or inaction on the part of the Custodian. In all cases, the Custodian shall not have any duty to question any such instructions or information from a Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) relating to his or her Custodial Account or to otherwise advise the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) regarding any matter relating thereto.

**16. Tax Matters.**

(a) *General.* The Custodian shall submit required reports to the Internal Revenue Service and the Depositor (the Authorized Agent, or, following the death of the Depositor, the Beneficiary); provided, however, that such individual shall prepare any return or report required in connection with maintaining the Account, or as a result of liability incurred by the Account for tax on unrelated business taxable income.

(b) *Annual Report.* As required by the Internal Revenue Service, the Custodian shall deliver to the Depositor (or following the death of the Depositor, the Beneficiary) a report(s) of certain transactions effected in the Custodial Account and the fair market value of the assets of the Custodial Account as of the close of the prior calendar year. Unless the Depositor (the Authorized Agent or following the death of the Depositor, the Beneficiary) sends the Custodian written objection to a report within ninety (90) days of receipt, the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) shall be deemed to have approved of such report, and the Custodian and the Company, and their officers, employees and agents shall be forever released and discharged from all liability and accountability to anyone with respect to their acts, transactions, duties and responsibilities as shown on or reflected by such report(s). The Company shall not incur any liability in the event the Custodian does not satisfy its obligations as described herein.

(c) *Tax Withholding.* Any distributions from the Custodial Account may be made by the Custodian net of any required tax withholding. If permitted by the Custodian, any distributions from the Custodial Account may be made net of any voluntary tax withholding requested by the Depositor (or, if permitted by the Custodian, the Authorized Agent, or, following the death of the Depositor, the Beneficiary). The Custodian shall be under no duty to withhold any excise penalty which may be due as a result of any transaction in the Custodial Account.

**17. Spendthrift Provision.** Subject to Section 10 above, any interest in the Account shall generally not be transferred or assigned by voluntary or involuntary act of the Depositor (or, following the death of the Depositor, the Beneficiary) or by operation of law; nor shall any interest in the Account be subject to alienation, assignment, garnishment, attachment, receivership, execution or levy except as required by law. However, this Section 17 shall not in any way be construed to, and the Custodian is in no way obligated or expected to, commence or defend any legal action in connection with this Agreement or the Custodial Account. Commencement of any such legal action or proceeding or defense shall be the sole responsibility of the Depositor (or following the death of the Depositor, the Beneficiary) unless agreed upon by the Custodian and the Depositor (or following the death of the Depositor, the Beneficiary), and unless the Custodian is fully indemnified for doing so to the Custodian's satisfaction. Notwithstanding the foregoing, in the event of a property settlement between a Depositor (or following the death of the Depositor, the Beneficiary) and his or her former spouse pursuant to which the transfer of a Depositor's (or following the death of the Depositor, the Beneficiary's) interest hereunder, or a portion thereof, is incorporated in a divorce decree or in an instrument, written or otherwise, incident to such divorce or legal separation, then the interest so decreed by a Court to be the property of such former spouse shall be transferred to a separate Custodial Account for the benefit of such former spouse, in accordance with Section 408(d)(6) of the Code and Section 10 above. In the event the Custodian is directed to distribute assets from the Custodial Account pursuant to a court order or levy, the Custodian shall do so in accordance with such order or levy and Section 10 above, and the Custodian shall not incur any liability for distributing such assets of the Account.

**18. Fees and Expenses.**

(a) *General.* The fees of the Custodian for performing its duties hereunder shall be in such amount as it shall establish from time to time, as communicated on the Schedule of Fees which accompanies this Agreement, or in some other manner acceptable to the Custodian. All such fees, as well as expenses (such as, without limitation, brokerage commissions upon the investment of funds, fees for special legal services, taxes levied or assessed, or expenses in connection with the liquidation or retention of all or part of a rollover contribution), shall be collected by the Custodian from cash available in the Custodial Account, or if insufficient cash shall be available, by sale, or withdrawal of sufficient assets in the Custodial Account and application of the sales proceeds, or funds withdrawn, to pay such fees and expenses. Alternatively, but only with the consent of the Custodian, fees and expenses may be paid directly to the Custodian by the Depositor (the Authorized Agent or following the death of the Depositor, the Beneficiary) by separate check.

(b) *Advisor Fees.* The Custodian shall, upon direction from the Depositor (or, following the death of the Depositor, the Beneficiary), disburse from the Custodial Account payment to the Depositor's (or, following the death of the Depositor, the Beneficiary's) registered investment advisor any fees for financial advisory services rendered with regard to the assets held in the Account. Any such direction must be provided in a form and manner acceptable to the Custodian. The Custodian shall not incur any liability for executing such direction. The Custodian shall be entitled to rely conclusively upon, and shall be fully protected in any action or non-action taken in full faith reliance upon any such fee disbursement direction.

(c) *Sale of Assets/Withdrawal of Funds.* Whenever it shall be necessary in accordance with this Section 18 to sell assets, or withdraw funds, in order to pay fees or expenses, the Custodian may sell, or withdraw, any or all of the assets credited to the Custodial Account at that time, and shall invest the portion of the sales proceeds/funds withdrawn remaining after collection of the applicable fees and expenses therefrom in accordance with Section 2. The Company or Custodian shall not incur any liability on account of its sale or retention of assets under such circumstances.

**19. Escrow.** With the consent of the Custodian, the Custodial Account may serve as an escrow arrangement to hold restricted distributions from defined benefit plans pursuant to applicable Income Tax Regulations. In such event, the Custodian will act in accordance with an escrow agreement acceptable to it and pursuant to which it will only act upon the direction of the trustee of the distributing plan with respect to distributions from the Account. Such agreement will remain in place until the trustee of the distributing plan releases the Custodian from such escrow agreement.

**20. Voting with Respect to Securities.** The Custodian shall deliver to the Depositor (or, following the death of the Depositor, the Beneficiary) all prospectuses and proxies that may come into the Custodian's possession by reason of its holding of Investment Company Shares or Other Funding Vehicles in the Custodial Account. The Depositor (the Authorized Agent, or, following the death of the Depositor, the Beneficiary) may direct the Custodian as to the manner in which any Investment Company Shares or Other Funding Vehicles held in the Custo-

dial Account shall be voted with respect to any matters as to which the Custodian as holder of record is entitled to vote, coming before any meeting of shareholders of the corporation which issued such securities, or of holders of interest in the Investment Company or corporation which issued such Investment Company Shares or Other Funding Vehicles. All such directions shall be in a form and manner acceptable to the Custodian, and delivered to the Custodian or its designee within the time prescribed by it. The Custodian shall vote only those securities and Investment Company Shares with respect to which it has received timely directions from the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary); provided however, that by establishing (or having established) the Custodial Account the Depositor (or following the death of the Depositor, the Beneficiary) authorizes the Custodian to vote any Investment Company Shares held in the Custodial Account on the applicable record date, for which no timely instructions are received, in the same proportions as the Custodian has been instructed to vote the Investment Company Shares held in the Custodial Accounts for which it has received timely instructions, but effective solely with respect to votes before January 1, 2003, only to the extent that such vote is necessary to establish a quorum.

**21. Limitations on Custodial Liability and Indemnification.** Neither the Custodian, the Company nor any agent or affiliate thereof provides tax or legal advice. Depositors, Beneficiaries and Authorized Agents are strongly encouraged to consult with their attorney or tax adviser with regard to their specific situation. The Depositor (or following the death of the Depositor, the Beneficiary) and the Custodian intend that the Custodian shall have and exercise no discretion, authority, or responsibility as to any investment in connection with the Account and the Custodian shall not be responsible in any way for the purpose, propriety or tax treatment of any contribution, or of any distribution, or any other action or nonaction taken pursuant to the Depositor's direction (or that of the Authorized Agent or, following the death of the Depositor, the Beneficiary). The Depositor (or following the death of the Depositor, the Beneficiary) who directs the investment of his or her Account shall bear sole responsibility for the suitability of any directed investment and for any adverse consequences arising from such an investment, including, without limitation, the inability of the Custodian to value or to sell an illiquid investment, or the generation of unrelated business taxable income with respect to an investment.

Unless the Depositor (the Authorized Agent or, following the death of the Depositor, the Beneficiary) sends the Custodian written objection to any statement, notice, confirmation or report within ninety (90) days of receipt from the Custodian, the Depositor (the Authorized Agent or the Beneficiary) shall be deemed to have approved of such statement, notice, confirmation or report, and the Custodian and the Company, and their officers, employees and agents shall be forever released and discharged from all liability and accountability to anyone with respect to their acts, transactions, duties and responsibilities as shown on or reflected by such statement, notice, confirmation or report(s).

To the fullest extent permitted by law, the Depositor (the Authorized Agent, or, following the death of the Depositor, the Beneficiary) shall at all times fully indemnify and save harmless the Custodian, the Company and their agents, affiliates, successors and assigns and their officers, directors and employees, from any and all liability arising from the Depositor's (the Authorized Agent's or following the death of the Depositor, the Beneficiary's) direction under this account and from any and all other liability whatsoever which may arise in connection with this Agreement except liability arising from gross negligence or willful misconduct on the part of the indemnified person. The Custodian shall not have any responsibility or liability for the actions or inactions of any successor or predecessor custodian of this Account.

**22. Delegation to Agents.** The Custodian may delegate to one or more entities the performance of recordkeeping, ministerial and other services in connection with the Custodial Account, for a reasonable fee (to be paid by the Custodian and not by the Custodial Account). Any such agent's duties and responsibilities shall be confined solely to the performance of such services, and shall continue only for so long as the Custodian named in the Application or its successor serves as Custodian or otherwise deems appropriate.

Although the Custodian shall have no responsibility to give effect to a direction from anyone other than the Depositor (or, following the death of the Depositor, the Beneficiary), the Custodian may, in its discretion, establish procedures pursuant to which the Depositor (or following the death of the Depositor, the Beneficiary) may delegate, in a form and manner acceptable to the Custodian, to a third party any or all of the Depositor's (or following the death of the Depositor, the Beneficiary's) powers and duties hereunder. Any such third party to whom the Depositor (or following the death of the Depositor, the Beneficiary) has so delegated powers and duties shall be treated as the Depositor (or following the death of the Depositor, the Beneficiary) for purposes of applying the preceding sentences of this paragraph and the provisions of this Agreement.

**23. Amendment of Agreement.** The Custodian may amend this Agreement in any respect at any time (including retroactively), so that it may conform with applicable provisions of the Code, or with any other applicable law as in effect from time to time, or to make such other changes to this Agreement as the Custodian deems advisable. Any such amendment shall be effected by delivery to the Custodian and to the Depositor (or, following the death of the Depositor, the Beneficiary) at his or her last known address, including an electronic address (as shown in the records of the Custodian) a copy of such amendment or a restatement of this Custodial Agreement. The Depositor (or following the death of the Depositor, the Beneficiary) shall be deemed to consent to any such amendment(s) if he or she fails to object thereto by sending notice to the Custodian, in a form and manner acceptable to the Custodian, within thirty (30) calendar days from the date a copy of such amendment(s) or restatement is delivered to the Depositor (or, following the death of the Depositor, the Beneficiary) to terminate this Custodial Account and distribute the proceeds, as so directed by the Depositor (the Authorized Agent, or, following the death of the Depositor, the Beneficiary).

**24. Resignation or Removal of Custodian.** The Company may remove the Custodian at any time, and the Custodian may resign at any time, upon thirty (30) days notice to the Depositor (the Authorized Agent, or, following the death of the Depositor, the Beneficiary). Upon the removal or resignation of the Custodian, the Company may, but shall not be required to, appoint a successor custodian under this Custodial Agreement; provided that any successor custodian shall satisfy the requirements of Section 408(a)(2) of the Code. Upon any such successor's acceptance of appointment, the Custodian shall transfer the assets of the Custodial Account, to such successor custodian; provided, however, that the Custodian is authorized to reserve such sum of money or property as it may deem advisable for payment of any liabilities constituting a charge on or against the assets of the Custodial Account, or on or against the Custodian or the Company. The Custodian shall not be liable for the acts or omissions of any predecessor or successor to it.
Upon acceptance of such appointment, a successor custodian shall be vested with all authority, discretionary or otherwise, of the Custodian pursuant to this Agreement. If no successor custodian is appointed by the Company, the Custodial Account shall be terminated, and the assets of the Account, reduced by the amount of any unpaid fees or expenses, will be distributed to the Depositor (or, following the death of the Depositor, the Beneficiary).

**25. Termination of the Custodial Account.** The Depositor (or, following the death of the Depositor, the Beneficiary) may terminate the Custodial Account at any time upon notice to the Custodian in a manner and form acceptable to the Custodian. Upon such termination, the Custodian shall transfer the assets of the Custodial Account, reduced by the amount of any unpaid fees or expenses, to the custodian or trustee of another individual retirement account (within the meaning of Section 408 of the Code) or other retirement plan designated by the Depositor (the Authorized Agent, or, following the death of the Depositor, the Beneficiary) as described in Article VIII, Section 9. The Custodian shall not be liable for losses arising from the acts, omissions, delays or other inaction of any such transferee custodian or trustee. If notice of the Depositor's (or, following the death of the Depositor, the Beneficiary's) intention to terminate the Custodial Account is received by the Custodian and the Depositor (or following the death of the Depositor, the Beneficiary) has not designated a transferee custodian or trustee for the assets in the Account, then the Account, reduced by any unpaid fees or expenses, will be distributed to the Depositor (or, following the death of the Depositor, the Beneficiary).

**26. Governing Law. This Agreement, and the duties and obligations of the Company and the Custodian under this Agreement, shall be construed, administered and enforced according to the laws of the Commonwealth of Massachusetts, except as superseded by federal law or statute.**

**27. When Effective.** This Agreement shall not become effective until acceptance of the Application by or on behalf of the Custodian at its principal office, as evidenced by a notice to the Depositor (or following the death of the Depositor, the Beneficiary).

## Things to Know Before Using Your Account

*The information in this box is only a summary. Please read the complete Agreement for more complete information.*

**Using your brokerage retirement account involves risks, for which you assume full responsibility.**

As the account owner, you are fully responsible for monitoring your account and for all investment decisions and instructions concerning your account. Unless we have contractually agreed otherwise, we have no responsibility for monitoring your account or your investment decisions, even if your decisions were based on our recommendations. Additionally, unless we have contractually agreed otherwise, your account is a brokerage account and not an investment advisory account subject to the Investment Advisers Act of 1940.

Placing orders during times when markets are volatile can be risky.

Before you start using your account or any account feature, it's essential that you understand the terms, conditions, and policies that apply. You should also understand your relationship with Fidelity, as described herein and in the FBS Form CRS, as well as the conflicts of interest that exist as described in the Products, Services, and Conflicts of Interest disclosure document, available online at Fidelity.com/Reg-BI-Master-Disclosure.

A joint owner or any one of multiple trustees can place any order in a joint account or trust account (including removing all of the assets) without the approval of the other owner(s) or trustee(s) and without any obligation on Fidelity's part to question the action.

**There are certain situations in which it is essential that you get in touch with us.**

You need to tell us immediately if any of the following occur:

- You notice anything incorrect or suspicious concerning your orders, account activity, or statements.
- Your financial circumstances or goals change.
- You become subject to laws or regulations concerning corporate insiders, the reporting of certain investments, or employment in the securities industry.

**The terms of this Agreement apply only to certain Fidelity retirement accounts.**

This account Agreement applies to Fidelity IRAs (including traditional, rollover, and SEP IRAs), Fidelity Roth IRAs, Fidelity SIMPLE IRAs, and Fidelity Retirement Plan accounts [Profit Sharing, Money Purchase, and Self-Employed 401(k) plans].

**Disputes between you and Fidelity are settled by arbitration.**

As with most brokerage accounts, the parties agree to waive their rights to sue in court, and agree to abide by the findings of an arbitration panel established in accordance with an industry self-regulatory organization.

## How to Contact Us

For matters concerning your account, including questions, changes, and notifications of errors, contact us:

**By Phone**

800-544-6666

**Online**

Fidelity.com

**In Writing**

Fidelity Investments
Client Services
PO Box 770001
Cincinnati, OH 45277-0045

## Who's Who in This Agreement

In this document, "Fidelity," "us," and "we" include Fidelity Brokerage Services LLC ("FBS") and National Financial Services LLC ("NFS") and their employees, agents, and representatives as the context may require. "You" and "account owner" refer to the owner indicated on the account application.

# About This Agreement

## Fidelity's Commitments to You

Under this Agreement, Fidelity has certain rights and responsibilities. When we accept your account application, we are agreeing to serve as your broker and to maintain an account for you. We agree, subject to our acceptance of an authorized order, to buy, sell, or otherwise dispose of, or acquire, securities for you according to your instructions. We also agree to provide various services and features, as described on the following pages.

## Your Commitments to Fidelity

Many of these commitments are spelled out more completely on the following pages, but, in general, when you sign the account application, you agree:

- to accept full responsibility for the content and accuracy of all authorized instructions placed on your account, and for all results and consequences of these instructions, including all investment decisions, trading orders, tax consequences, and all instructions placed by you or any other person you authorize
- to pay all fees, charges, and expenses incurred on your account, in accordance with the provisions of this Agreement and the fee schedule in effect at the time (a current schedule is attached hereto and incorporated herein); for services we perform at your request that are not covered in our current fee schedule, you agree to pay the applicable fee
- to maintain enough assets in your account to satisfy all obligations as they become due, and to understand that we may take whatever steps we consider necessary to resolve unpaid debts or other obligations
- to use the account and its features according to this Agreement and for your own personal purposes only
- to conduct business with Fidelity and its affiliates electronically, which necessarily includes having your personal financial information transmitted electronically, and to electronic delivery of all documents (including your initial notice of our privacy policy) and communications related to this account and all your other Fidelity accounts as detailed in the Electronic Delivery Agreement, which is incorporated herein by reference. Since electronic (including wired and wireless) communications may not be encrypted, you acknowledge that there is a risk that data, including email, electronic and wireless communications, and personal data, may be accessed by unauthorized third parties when communicated between you and Fidelity or between you and other parties
- to provide and maintain as current both your mobile phone number and email address as both are required for account security, transactional alerts, and delivery of other communications. You consent to Fidelity's use of your email address and/or mobile phone number to message, call, or text you for these purposes. Message and data rates apply and frequency may vary. For help with texts, reply HELP. To opt out of texts, reply STOP. You acknowledge that you can update your contact information through your profile on Fidelity.com
- to keep secure your account number, username, and password, and any devices, such as mobile phones or pagers, you use in connection with your account
- to let us monitor and/or record any phone conversations with you
- to let us create a digital representation of your voice, a "voiceprint," that may be used for verifying your identity when you contact Fidelity
- to let us verify the information you provide and obtain credit reports and other credit-related information about you at any time, such as payment and employment information, and to permit any third-party financial services provider to do likewise
- to resolve disputes concerning your relationship with us (other than class actions) through arbitration rather than in a court of law
- if applying for, or using, any optional features or services (including online or other electronic services), to understand and accept the terms associated with them



EXHIBIT B

- to protect Fidelity against losses arising from your use of market data and other information provided by third parties
- to read the fund's prospectus, including its description of the fund, the fund's fees and charges, and the operation of the fund, whenever you invest in, or exchange into, any mutual fund (including any fund used for your core position)
- to notify us in writing anytime there is a material change in your financial circumstances or investment objectives
- to be bound by the current and future terms of this Agreement, from the time you first use your account or sign your application, whichever happens first
- that if you have authorized someone to act on your behalf in your account, any and all disclosures may be provided solely to you or the individual acting on your behalf as part of the scope of his or her authority
- that we are authorized by you to use information related to you or any of your accounts, including information that Fidelity or its affiliates obtain in connection with services to or through your employer or a workplace plan or other benefit
- If Fidelity has a reasonable belief that financial exploitation of an elder or vulnerable adult has or is being attempted or has occurred, Fidelity may, in its sole discretion, notify a person reasonably associated with the elder or vulnerable adult. A reasonably associated person is an immediate family member of the customer, a person who is currently or was previously authorized with any level of access on any of the customer's accounts, or who is currently or was previously a beneficiary on any of the customer's accounts.

# Account Features

Certain features and services are standard with your Fidelity retirement account. Others are optional, and may be added either when you open your account or later. Note that some features and fees vary depending on the nature of your relationship with Fidelity.

Industry regulations require that Fidelity Brokerage Services LLC (FBS) and its clearing firm, National Financial Services LLC (NFS), allocate between them certain functions regarding the administration of your account. The following is a summary of the allocation of those functions performed by FBS and NFS.

FBS is responsible for:

- Obtaining and verifying account information and documentation.
- Opening, approving and monitoring trading and other activity in your account.
- Acceptance of orders and other instructions from you regarding your account, and for promptly and accurately transmitting those orders and instructions to NFS.
- Determining the suitability of investment recommendations and advice, and that those persons placing instructions for your account are authorized to do so.
- Operating and supervising your account and its own activities in compliance with applicable laws and regulations, including compliance with federal, industry and NFS margin rules pertaining to your margin account and for advising you of margin requirements.
- Maintaining the required books and records for the services it performs.
- Investigating and responding to any questions or complaints you have about your account(s), confirmations, your periodic statement or any other matter related to your account(s). FBS will notify NFS with respect to matters involving services performed by NFS.

NFS is responsible, at the direction of FBS, for:

- The clearance and settlement of securities transactions.
- The execution of securities transactions, in the event NFS accepts orders from FBS.
- Preparing and sending transaction confirmations and periodic statements of your account (unless FBS has undertaken to do so).
- Acting as custodian for funds and securities received by NFS on your behalf.
- Following the instructions of FBS with respect to transactions and the receipt and delivery of funds and securities for your account.
- Extending margin credit for purchasing or carrying securities on margin.
- Maintaining the required books and records for the services it performs.
- NFS will not give you advice about your investments and will not evaluate the suitability or best interest (if applicable) of investments made by you, your investment representative, or any other party.

## Standard Features

### Securities Trading

This account is a brokerage account that allows the trading and holding of many securities that are publicly traded in the United States, such as most securities in these categories:

- stocks, including common and preferred
- bonds, including corporate, municipal, and government, certificates of deposit (CDs) and credit union share certificates (CUSCs)
- unit investment trusts (UITs)
- convertible securities
- mutual funds, including Fidelity funds, non-Fidelity funds, exchange-traded funds (ETFs), and closed-end funds
- options, although retirement accounts are only eligible for writing covered calls, buying calls/puts, and buying long straddles/strangles/combinations with respect to index and equity options in all cases
- options spreads may be permitted in IRA accounts provided certain conditions are met; please contact your Fidelity Representative for more information

The account can be used to trade certain foreign securities (either directly or as depositary receipts) and certain precious metals.

Participation in shareholder voting and/or dividend payments in non-U.S. securities is subject to the rules and regulations of the non-U.S. market in which the security was issued and may require the disclosure of your personal information, including, but not limited to, name, address, and country of citizenship and/or residence.

Aggregate, non-personal data may be made publicly available on our websites, online services, and/or mobile applications. Aggregate, non-personal data may also be shared with clients, affiliates, and third parties consistent with applicable law.

Some investments that **cannot** be traded through your Fidelity retirement account are futures and commodities.

When you place a trade, you may have a choice of order types, including market orders, limit orders, stop orders, and stop-limit orders. To find out how these different types of orders work, and for other helpful information, go to Fidelity.com/brokerage. Fidelity may refuse to accept or execute any order or instruction related to your account, for any reason and at any time, in its sole discretion.

### Trading Foreign Securities

Fidelity offers you different ways to trade foreign stocks: "International Trading," "Dollarized International Trading," or "Foreign Ordinary Share Trading." International Trading allows you to trade most common stocks and exchange-traded funds (ETFs) directly in the local market with an option to settle your trade in U.S. dollars or in the local currency. Foreign Ordinary Share Trading allows you to trade shares in foreign corporations in the over-the-counter (OTC) market through a U.S. market maker. All customers trading foreign securities should be aware of certain risks described below:

Trading in foreign securities, including direct investments in foreign markets, involves various investment risks, including foreign exchange risk (the possibility that foreign currency will fluctuate in value against the U.S. dollar); increased volatility as compared to the U.S. markets; political, economic, and social events that may influence foreign markets or affect the prices of foreign securities; lack of liquidity (foreign markets may have lower trading volumes and fewer listed companies, shorter trading hours, and restrictions on the types of securities that foreign investors may buy and sell); and less access to information about foreign companies. Trading in foreign securities also may be subject to various credit, settlement,

operational, financial, and legal risks. Emerging markets, in particular, can be subject to greater social, economic, regulatory, and political uncertainties, and can be extremely volatile.

These risks may include but are not limited to:

**Physical Markets.** Certain countries may have less regulated or less liquid securities markets. Some countries still rely on physical markets that require delivery of properly endorsed share certificates to complete trades. As a result, the settlement process can be lengthy (and erratic in some markets) and carries an increased risk of failure, including, but not limited to, the failure of the counterparty to deliver securities in exchange for payment.

**Misidentification of Securities.** Foreign companies may have multiple classes of securities, including "foreign" and "local" shares. Inadequate understanding of a foreign company's capital structure or imprecision in placing orders can result in purchasing the wrong securities.

**Non-DVP Transactions.** Local trading and settlement customs frequently require non-DVP ("delivery versus payment") transactions. Unlike DVP transactions, which involve a simultaneous exchange of securities and payment, non-DVP transactions can increase counterparty risk because the purchaser pays before securities are delivered or the seller delivers securities before payment is made.

**Trading Days and Hours.** Differences in trading days and hours can also create operational issues, trading delays, and complicate clearance and settlement. Unless indicated otherwise, all online trading hours are reflected in U.S. Eastern time. Foreign securities orders will not be sent to the local market except during market hours in the specified country. Orders entered during such nonmarket hours will be released to the local market before it opens. Foreign exchange orders for a given trade date may be entered up until 5 p.m. Eastern time. Any orders submitted after this time will be submitted for execution on the following trade date. Generally, the settlement date for orders placed together for foreign securities and foreign exchange corresponds to the settlement date for the underlying security, absent differences in bank and local market days of operation.

**Cross-Border Settlement.** Cross-border settlement involves the interaction of different settlement systems and differing (and potentially inconsistent) laws in each of the affected countries.

**Dividend and Reorganization Payments.** Dividend and reorganization payments are paid when funds are received from local market custodians, which may or may not coincide with the actual announced payment date. Participation in shareholder voting and/or dividend payments in non-U.S. securities is subject to the rules and regulations of the non-U.S. market in which the security was issued and may require the disclosure of your personal information, including but not limited to name, address, and country of citizenship and/or residence.

**Trading Restrictions and Market Operations.** Foreign markets often operate differently from U.S. markets. For example, there may be different periods for clearance and settlement of securities transactions, and investments in foreign securities may be subject to local market trading restrictions and fees. Certain markets may impose restrictions regarding repatriation of monies or limit certain investment activities. Fidelity is not responsible for notifying customers of each country's specific requirements. Customers agree to conduct appropriate due diligence to understand specific limitations in each country.

**Margin Privileges.** Extension of margin credit in foreign securities may result in greater risk than U.S. securities. Foreign securities may be eligible for margin privileges when a brokerage account has been opened and the customer has applied and been approved for margin trading.

**Limited Recourse Under Local Law.** A U.S. investor may not be able to sue a foreign issuer or a Foreign Executing Broker, or to enforce a judgment in U.S. courts. The only available remedy may be the legal remedies that are available under foreign law, and those remedies may be limited.

**Tax Treatment.** There may be negative tax consequences when trading in certain countries. You should consult a tax advisor for further information.

Foreign securities positions that are not in the custody or control of NFS are not covered by SIPC or any additional insurance secured by NFS.

Fidelity may limit, restrict, or terminate your ability to trade in certain foreign securities at any time and in Fidelity's sole discretion.

Please refer to Additional Information for more on Fidelity's brokerage fee schedules, fees for various features and services, and margin borrowing charges. Note that foreign jurisdictions may impose additional fees, taxes, or other charges from time to time, which may not be reflected in the fee schedule in effect at that time. By placing a trade in a foreign security, you agree to pay any such applicable fees, taxes, or other charges, regardless of notice.

## Foreign Currency Exchange Risk Disclosure Statement

While this brief statement cannot disclose all risks associated with trading in foreign currency, when considering whether to trade or authorize someone else to trade foreign currency for you, you should be aware of the following:

**The Risk of Loss in Trading Foreign Currency Can Be Substantial.** You should, therefore, carefully consider whether trading foreign currency is suitable for you in light of your financial condition, risk tolerance, and understanding of foreign markets.

**Cash Held in Foreign Currency.** To the extent that you hold all or a portion of your cash assets in a currency other than your local currency, you may suffer currency losses from unfavorable exchange rate movements that reduce the value of your cash assets compared to your local currency. These potential losses could leave you without sufficient cash to pay planned expenses or other liabilities.

**Impossible to Liquidate.** Under certain market conditions, you may find it difficult or impossible to liquidate an investment. This can occur, for example, when a currency is deregulated or fixed trading bands are widened. Certain currencies may not be available to invest in, sell through, or hold at Fidelity. Exchange practices, including currency controls, may change from time to time without notice. As a result, it is important that you understand the practices in the foreign markets in which you trade.

**Currency Trading Is Speculative and Volatile.** Currency prices are highly volatile. Price movements for currencies are influenced by, among other things, changing supply-demand relationships; trade, fiscal, monetary, exchange control programs and policies of governments; U.S. and foreign political and economic events and policies; changes in national and international interest rates and inflation; currency devaluation; and sentiment of the marketplace. None of these factors can be controlled by you or any individual advisor, and no assurance can be given that you will not incur losses from such events.

**Currency Trading Presents Unique Risks.** Fidelity, through its affiliate Fidelity FOREX, LLC ("Fidelity FOREX"), may refuse to quote prices for certain currencies or quote wide spreads for currencies that are experiencing high levels of volatility.

**Broker Compensation.** Fidelity serves as agent rather than principal to the foreign currency transaction. Fidelity sends the transaction to Fidelity FOREX for the foreign exchange transaction.

**Fidelity FOREX Is an Affiliate of Fidelity.** Fidelity FOREX acts as a principal on the currency exchange. Fidelity FOREX imposes a commission, or markup, to the price they receive from the interbank market, which may result in a higher price to you. Fidelity FOREX may in turn share a portion of any foreign exchange commission or markup with Fidelity. More favorable exchange rates may be available through third parties not affiliated with NFS. Larger transactions for foreign currency may receive more favorable rates than smaller transactions.

**Foreign Currency Balances.** Customers acknowledge that credit balances in foreign currency may or may not earn interest.

## Extended-Hours Trading Risk Disclosure Statement

Trading in the extended hours (outside of the standard market hours, generally 9:30 a.m. to 4 p.m. Eastern time) may pose greater risks than the risks you take when you trade during standard market hours. You should review and understand these risks prior to engaging in extended-hours trading.

**Liquidity, Volatility, and Price Spreads.** Prices are based on the supply and demand created by other sellers and buyers. Because there are generally fewer participants trading during the extended-hours sessions, there may be wider price spreads, reduced liquidity, and higher volatility. These conditions may prevent your orders from being executed, in whole or in part, or you may receive a less favorable price than you might receive during standard market hours. Additionally, the prices of investments traded in extended-hours trading may not reflect the prices at the end of regular trading hours, or at opening the next morning.

**Communication Delays.** If there is a high volume of orders, increased number of communications being sent, or other computer system problems, you may experience delays or failures in communication that cause delays in or prevent access to current information about the investments you're considering, or in executing your order.

**Time and Price Priority of Orders.** Orders in the extended-hours sessions are generally handled in a price/time priority manner. Orders are first prioritized according to price, with the orders at the same price ranked based on the time the order was submitted. There is no trade through protection during the extended-hours sessions, so price/time priority is set by each market center, not across market centers. This may prevent your order from being executed, in whole or in part, or prevent you from receiving as favorable a price as you might receive during standard market hours. If you change your order, your change is treated as a cancellation and replacement, which may cause it to lose its time priority.

**Access to Other Markets and Market Information.** Not all market centers are connected in extended-hours trading sessions, and not all market centers offer extended-hours trading during the same time periods. This means there may be greater liquidity or a more favorable price for a particular security in another market center. Access to quotes and trading information in other market centers may be limited during extended-hours sessions. Normally, issuers make news announcements that may affect the price of their securities after regular trading hours. Similarly, important financial information is frequently announced outside of regular trading hours. Keep in mind that news stories and related announcements, coupled with lower liquidity and higher volatility, may cause an exaggerated and unsustainable effect on the price of a security.

**Trading Options Securities.** There is a risk of lack of calculation or dissemination of the underlying index value or Intraday Indicative Value ("IIV") and lack of regular trading in securities underlying indexes. For certain products, an updated underlying index, portfolio value, or IIV will not be calculated or publicly disseminated during Extended Trading Hours. Because the underlying index or portfolio value and IIV are not calculated or widely circulated during extended trading hours, an investor who is unable to calculate implied values for certain products during extended trading hours may be at a disadvantage to market professionals. Securities underlying the indexes or portfolios will not be regularly trading as they are during regular trading hours, or may not be trading at all. This may cause prices during extended trading hours to not reflect the prices of those securities when they open for trading.

## Penny Stock Trading Risk Disclosure Statement

Low-priced securities, or penny stocks, generally trade for less than $5 per share and have a relatively small market capitalization. Before engaging in penny stock trading, you should carefully review and consider the following risks, which can be exacerbated in periods of market volatility:

**Lack of Public Information.** Reliable, publicly available information about the penny stock you're considering may not be available or as accessible as information about securities that trade on major exchanges. This can include information about the management, operations, financials, and other aspects of a company may not be available. As a result, it is less likely that quote prices will be based on full and accurate information about the company.

**No Minimum Listing Standards.** Companies that trade on major exchanges like the New York Stock Exchange or Nasdaq must meet minimum standards for the amount of net assets they have and the numbers of shareholders invested in their companies. In contrast, companies that trade as penny stocks in the OTC market may be subject to reduced or no minimum listing standards.

**Liquidity Risk.** Demand may not be constant for penny stocks, which means you may not be able to sell when you want to. You should carefully consider that you may have difficulty selling the stock, and that this could impact the sale price.

**High Volatility.** Penny stocks are susceptible to and can experience large price swings in a short amount of time. These swings may be exacerbated during periods of overall market volatility.

**Fraud.** Since reliable, publicly available information on penny stock is often limited and there is generally less liquidity and trading volume, these stocks can be a target for price or volume manipulation and other fraudulent activity.

For more information on penny stocks and their risks, see the three-part Investor Bulletin: Microcap Stock Basics from the SEC.

## Core Account

Your Fidelity retirement account includes a core account that holds assets awaiting investment or withdrawal. Any amount in your core account will be held in the core position specified on your Fidelity retirement account application or as otherwise selected by you.

As detailed below, the options for your core position may include a money market mutual fund, a bank sweep (sometimes referred to as herein as the "FDIC-Insured Deposit Sweep" or "Bank Sweep") or a free credit balance. Note that some of these options may not be available until after the account is established and may not be available to all retirement account types. With respect to both investment yield and compensation to Fidelity, results will typically vary across available core options. Generally, Fidelity earns more compensation when your funds are invested in products or services offered by an affiliate of Fidelity. The core option specified in the account application may not always provide the highest yield, based in part on the then-current interest rate environment. See the applicable mutual fund prospectus or FDIC-Insured Deposit Sweep Program Disclosure, as applicable, for more information. Fidelity reserves the right to make changes to the available options and/or the options available to you for your core position.

For purposes of this Core Account section of this Agreement, the free credit balance will be referred to as the "Interest Bearing Option." This is different from the Intra-day Free Credit Balance described in the Credits to Your Account section of this Agreement. Like any free credit balance, the Interest Bearing Option represents an amount payable to you on demand by Fidelity. Subject to applicable law, Fidelity may use this free credit balance in connection with its business. Fidelity may, but is not required to, pay you interest on this free credit balance, provided that the accrued interest for a given day is at least half a cent. Interest, if paid, will be based upon a schedule set by Fidelity, which may change from time to time at Fidelity's sole discretion.

More details about the money market mutual fund can be found in the money market mutual fund's prospectus, which will be made available to you when applicable.

More details about the Bank Sweep can be found on the FDIC-Insured Deposit Sweep Program disclosure document (the "Program Disclosure"), which is attached hereto, incorporated herein, and forms a part of this Agreement. Please note that, as more fully described in the Program Disclosure, the FDIC-Insured Deposit Sweep Program allows for the sweeping of Cash Balances into a money market mutual fund (this feature is known as the "Money Market Mutual Fund Overflow" or "MMKT Overflow") in certain circumstances. The Bank Sweep together with the MMKT Overflow make up the components of the FDIC-Insured Deposit Sweep Program.

Newly established Fidelity IRAs (including traditional, rollover, and SEP IRAs), and newly established Fidelity Roth IRAs and Fidelity SIMPLE IRAs, will use the core position specified on the account application. Note that inherited IRAs and any IRAs, Roth IRAs, or SIMPLE IRAs that utilize an investment advisory service offered by Fidelity Personal and Workplace Advisors LLC ("FPWA") will not have the option to use the Bank Sweep.

Once the Fidelity IRA, Fidelity Roth IRA, or Fidelity SIMPLE IRA is established, you may be able to switch the core position to another available option. Information about the rates of return on these different options can be found at Fidelity.com/IRACoreRates.

After your Fidelity retirement account has been opened, there may be situations where your core position must be changed from the option you currently use to another available option. Upon receiving advance written notice of such change, unless you contact Fidelity and inform us otherwise within the time frame specified in the notice, you will be deemed to (i) consent to such change and (ii) direct Fidelity to withdraw your funds from the core position you currently use and place those funds in the new core position.

#### If You Reside Outside the United States

If we determine that you reside outside the United States in any country other than Canada (as described in the Residing Outside the United States section of this Agreement), either at the time you open your Fidelity retirement account or at any point in time after you open your Fidelity retirement account (e.g., as a result of a subsequent move), your

core account will not operate as described elsewhere in this Agreement. Instead, during such time as we believe you reside outside the United States, the following will apply:

1. New Fidelity Accounts.
The core position as specified on your Fidelity retirement account application or as otherwise selected by you will not be changed, but the process of sweeping the Intra-day and After-hours Free Credit Balances to your core account (as described in the Credits to Your Account section of this Agreement) will be suspended. As a result, all uninvested cash in your Fidelity retirement account will be held as Intra-day and After-hours Free Credit Balances. You will also be unable to make any change to your core position, including making any changes to the Program Bank List assigned to your Fidelity retirement account, in the event the Bank Sweep is your core position.

2. Existing Fidelity Accounts.
The process of sweeping the Intra-day and After-hours Free Credit Balances to your core account will be suspended. This will not affect any existing holdings of a Fidelity money market fund, or your Program Deposits. You will be able to liquidate that position should you elect to do so, but you will generally be unable to add to it for so long as we believe you reside outside the United States, except for the deposit of accrued interest in the case of the Bank Sweep or the reinvestment of dividends on money market mutual fund positions. As a result, all new deposits to your Fidelity retirement account or settlement proceeds from transactions in your account will be held as Intra-day and After-hours Free Credit Balances. You will also be unable to make any change to your core position, including making any changes to the Program Bank List assigned to your Fidelity retirement account, in the event the Bank Sweep is your core position.

Should we determine that you no longer reside outside the United States, if your Fidelity retirement account was subject to a suspension, this suspension will be lifted, the Intra-day and After-hours Free Credit Balances will be swept to your core account and, going forward, your Fidelity retirement account will operate as otherwise described herein.

For Fidelity Retirement Plan accounts (including Profit Sharing, Money Purchase, and Self-Employed 401(k) plan accounts), the core position is generally Fidelity® Government Cash Reserves or any other core position that Fidelity might make available for this purpose.

If you establish or maintain a Fidelity IRA (including traditional, rollover, and SEP IRAs), a Fidelity Roth IRA, or a Fidelity SIMPLE IRA and you wish to transfer to or otherwise utilize an investment advisory service offered by FPWA, as a condition of enrolling in such service, your core position will be a then available Fidelity money market mutual fund (generally Fidelity Government Cash Reserves or any other core position Fidelity might make available for this purpose). As a result, any balance in the Bank Sweep or other core position will be liquidated prior to such a transfer or utilization.

If you maintain a Fidelity IRA (including traditional, rollover, and SEP IRA), a Fidelity Roth IRA, or a Fidelity SIMPLE IRA and you wish to establish a relationship with an independent third-party investment adviser that utilizes Fidelity or its affiliates for clearing and custody services and technology support, your core position will be a then available money market mutual fund or other core position Fidelity might make available for this purpose. As a result, any balance in the Bank Sweep or other core position must be liquidated in connection with the establishment of such relationship.

The Bank Sweep is not available in inherited IRAs (including inherited Roth IRAs). Therefore, in connection with the establishment of an inherited IRA, prior to transferring the assets to the inherited IRA, any balance maintained by the deceased IRA depositor in the Bank Sweep will be liquidated.

If your Fidelity IRA, Fidelity Roth IRA, or Fidelity SIMPLE IRA was established by your employer in accordance with the terms of your workplace savings plan and your employer elected as the core position a then available Fidelity money market mutual fund (generally Fidelity Government Cash Reserves or any other core position Fidelity might make available for this purpose), at the time that you activate your employer-established IRA, you will not be able to select the Bank Sweep. Your only available core position at that time will be a then available Fidelity money market mutual fund (generally Fidelity Government Cash Reserves or any other core position Fidelity might make available for this purpose). However, after you activate your IRA, you may switch the core position between the Bank Sweep and any then available Fidelity money market mutual fund option without restriction.

### Statements

We will send an account statement to the address of record:

- every calendar quarter, at a minimum
- for any month when you have trading or cash management activity

Your account statements will show all activity in your account for the stated period, including securities transactions, cash balances, credits and debits, and all fees paid directly from your account.

We will also send a confirmation for every securities transaction in your account. The only exceptions are automatic investments, automatic withdrawals, dividend reinvestments, automatic redemptions from money market mutual funds, certain fractional share liquidations, and transactions that involve only your core position or the Intra-day Free Credit Balance; for these activities, your regular account statement serves in place of a confirmation.

If you live with immediate family members who also have eligible Fidelity accounts, Fidelity may "household" those accounts to potentially qualify for enhanced services and features and to send statements and disclosures together to a common address. You may also elect to have your statements combined or householded by completing the information requested at Fidelity.com/customer-service/how-to-combine-statements. By participating in householding, you agree that Fidelity may provide the employers of any householded account holders with account statements, trade confirmations, or other documents as required by applicable regulations.

In addition, by signing the account application, you consent to have only one copy of Fidelity mutual fund shareholder documents, such as prospectuses and shareholder reports ("Documents"), delivered to you and any other investors sharing your address. Your Documents will be householded indefinitely; however, you may revoke this consent at any time by contacting Fidelity. Additional details regarding your consent are provided in the account application.

### Account Protection

The securities in your account (including any amounts in the MMKT Overflow) are protected in accordance with the Securities Investor Protection Corporation (SIPC) for up to $500,000 (including up to $250,000 for uninvested cash). We also provide additional coverage above these limits. Neither coverage protects against a decline in the value of your securities, nor does either coverage extend to certain securities that are considered ineligible for coverage.

For more details on the SIPC, or to request an SIPC brochure, visit www.sipc.org or call 202-371-8300.

Please note that if you utilize the Bank Sweep, except as otherwise described in the Core Account section of this Agreement, and in the Product Disclosure, in general balances you maintain in your account will be swept to an FDIC-insured position at a bank with which Fidelity has established a relationship (a "Program Bank"). Until funds are swept to the Program Bank, they are covered by SIPC. Once funds are swept to a Program Bank, they are no longer covered by SIPC, but they are eligible for FDIC insurance subject to FDIC insurance coverage limits. For more information about the Bank Sweep, please refer to the FDIC-Insured Deposit Sweep Program Disclosures document, which is attached hereto, incorporated herein, and forms a part of this Agreement.

## Optional Features

You can set up these services using your account application. To add them to an existing account, contact Fidelity. Some of these features are covered by their own customer agreements, which are incorporated into this Agreement by reference (are legally considered part of this Agreement) and will be provided to you as applicable. Note that some services are not available for certain types of accounts.

### Checkwriting

Checkwriting is available on certain retirement accounts. Note that cancelled checks are not returned to you, although check imaging may be available.

### Electronic Funds Transfer

You may transfer cash in and out of your account using electronic funds transfer (EFT), which works like an electronic check. You can also arrange for your brokerage account to receive periodic payments from other accounts, or transfers from other sources, such as Automatic Investments.

### Dividend Reinvestment

In addition to reinvestment of mutual fund dividends, reinvestment of dividends from eligible equities and closed-end funds is an option for most retirement accounts. You can choose to have the service apply to all eligible securities in your account, or only to certain ones. You can request this feature by phone, online, or in writing (for all securities or for individual ones) once you have established your account.

## Fidelity MyVoice®

Fidelity MyVoice® is a free security service. When you call Fidelity, you'll no longer have to enter PINs or passwords because Fidelity MyVoice helps you interact with us securely and more conveniently. Through natural conversation, MyVoice will detect and verify your voiceprint in the first few moments of the call. A voiceprint is a combination of your physical and behavioral voice patterns. Like a fingerprint, it's unique to you.

## Mobile Phone Number Security Check

In order to protect your account, we may review any changes made to your mobile phone number to ensure that a newly entered number is not associated with any known fraudulent activity. You authorize your mobile provider to disclose information about your mobile phone account, such as subscriber status, payment method (whether your account is prepaid or is subject to monthly billing), and device details, if available, to support identity verification and fraud avoidance, and for other security purposes for the duration of your business relationship with us. This information may also be shared with certain third-party companies whose services we utilize for security to support your transactions with us, and for identity verification and fraud avoidance purposes.

## Accessing Your Account

There are a variety of ways you can place orders, access your account, get market and investment information, or contact Fidelity. Online choices include Fidelity.com, Fidelity Active Trader Pro®, alerts and wireless trading services, the Fidelity Investments mobile app, and other interactive services for computers or hand-held devices. Some of these services are offered by Fidelity directly; others are offered by outside providers.

Telephone choices include Fidelity Automated Service Telephone (FAST®) as well as Fidelity's telephone representatives. Both services are generally available 24 hours a day, seven days a week. You can also speak with a Fidelity Representative in person, during business hours, at any of our Fidelity Investor Centers around the country. Please note that our telephone lines may be recorded, and, by signing the account application, you are consenting to such recording. If you do not wish to be recorded, you should contact Fidelity via another means.

# Account Policies

## Account Registration

### Custodial Accounts

For accounts opened by a parent, guardian, or custodian for the benefit of a minor: By opening this type of account, you agree that all account assets will be used only for the minor's benefit. Note that the IRA Custodian or Plan Trustee may restrict the use of this type of account.

### Authorization and Direction to Obtain and Use Information Related to You

You authorize us to obtain and use information related to all of your accounts, workplace plans or other benefits, or other information related to you that may be maintained by us or any of our affiliates, including without limitation information related to your accounts, participation, or benefits that we or any Fidelity affiliate may obtain in connection with providing services to or through your employer or a workplace plan or other benefit. We may use this information for any purpose not prohibited by law, such as in the provision of enhanced or integrated services or more personalized communications, but the information shall not be required to be used for any specific purpose.

## Account Usage

### First Use of a Core Account

If a money market mutual fund is your core position, making your first investment into that fund is your acknowledgment that you have received and read a prospectus or profile prospectus for that fund.

### Retirement Account Funding for Canadian Residents

If you have provided Fidelity with an address and/or tax information that indicates that you are a resident of Canada, you warrant and represent to Fidelity that any cash or assets used to fund this account constitute proceeds from an existing IRA or retirement plan account previously established in the United States for your benefit.

### Prohibited Uses and Actions

You are strictly prohibited from using your account in conjunction with any business as a broker-dealer, trader, agent, or adviser in any type of security, commodity, future, or contract, or in any business or organization connected with individuals performing these functions. You are also prohibited from publicizing or sharing with anyone any information you obtain through your account (such as securities quotes). In addition, be aware that we may freeze your account or suspend certain privileges, features, or services at any time without notice.

### Limits on Mutual Fund Trades

Because excessive trading in mutual fund shares can be detrimental to a fund and its shareholders, we may block account owners or accounts that engage in excessive trading from making further transactions in fund shares. A block on trading fund shares may be temporary or permanent, and may apply only to certain mutual funds or all mutual funds, including Fidelity funds.

The decision to impose a block may originate with a mutual fund company or may be made by Fidelity at the brokerage account level, if Fidelity believes such a block is warranted. To see what a given fund company's definition of "excessive trading" is, check the fund's prospectus.

In addition, we may restrict or limit any transaction in any mutual fund or other investment company that we or an affiliate manages or advises if we believe the transaction could adversely affect the investment company or its shareholders.

## How Transactions Are Settled

### Credits to Your Account

During normal business hours ("Intra-day"), activity in your account such as deposits and the receipt of settlement proceeds are credited to your account and may be held as a free credit balance (the "Intra-day Free Credit Balance").

Activity in your account such as deposits and the receipt of settlement proceeds may also occur after the cut-offs described above, or on days the market is not open and the Fedwire Funds Service is not operating (collectively "After-hours"). Those amounts are credited to your account and may be held as a free credit balance (the "After-hours Free Credit Balance").

Like any free credit balance, the Intra-day and After-hours Free Credit Balances represent amounts payable to you on demand by Fidelity. Subject to applicable law, Fidelity may use these free credit balances in connection with its business. Fidelity may, but is not required to, pay you interest on free credit balances held in your account overnight, provided that the accrued interest for a given day is at least half a cent. Interest, if paid, will be based upon a schedule set by Fidelity, which may change from time to time at Fidelity's sole discretion.

Interest paid on free credit balances will be labeled "Credit Interest" in the Investment Activity section of your account statement. Interest is calculated on a periodic basis and credited to your account on the next business day after the end of the period. This period typically runs from approximately the 20th day of one month to the 20th day of the next month, provided, however, that the beginning and ending periods each year run, respectively, from the 1st of the year to approximately the 20th of January and approximately the 20th of December to the end of the year. Interest is calculated by multiplying your average overnight free credit balance during the period by the applicable interest rate, provided, however, that if more than one interest rate is applicable during the period, this calculation will be modified to account for the number of days each period during which each interest rate is applicable.

### If You Utilize a Fidelity Money Market Fund as Your Core Position

If you utilize a Fidelity money market fund as your core position, the Intra-day Free Credit Balance, if any, generated by activity occurring prior to the market close each business day (or 4 p.m. Eastern time on business days when the market is closed and the Fedwire Funds Service is operating) is automatically swept into your core account and invested in your core position at the market close.

There will be additional automatic sweeps into your core account early in the morning prior to the start of business on each business day that will also be invested in your core position at that time. These will include your After-hours Free Credit Balance along with credit amounts attributed to certain actual or anticipated transactions that would otherwise generate an Intra-day Free Credit Balance on such business day.

### If You Utilize the Bank Sweep as Your Core Position

If you utilize the Bank Sweep as your core position, the Intra-day Free Credit Balance, if any, as well as any After-hours Free Credit Balance generated by activity occurring prior to Fidelity's nightly processing cycle are automatically swept into your core account as part of that nightly cycle (the "Evening Bank Sweep") and reflected in your Account as Program Deposits (as defined infra.) in anticipation of the deposit process described below occurring on the next business day.

There will be an additional automatic sweep into your core account early in the morning prior to the start of business on each business day that will also be invested in your core position at that time (the "Morning Bank Sweep"). This will include credit amounts attributed to certain actual or anticipated transactions that would otherwise generate an Intra-day Free Credit Balance on such business day.

The total amount of the Evening Bank Sweep and the Morning Bank Sweep is referred to as your Cash Balance. In the morning of the business day of the Morning Bank Sweep, your Cash Balance will be deposited in an FDIC-insured interest-bearing account (a "Program Deposit Account") at one or more participating banks (each, a "Program Bank"). The amounts on deposit are collectively referred to as your Program Deposits, and Program Deposits are eligible for FDIC insurance up to certain limits. Please note that in the event you have cash balances greater than either a) amount that the bank sweep program can place at the participating banks, or b) amounts that exceed the total FDIC insurance offered by the Program, excess funds will be swept into a money market mutual fund (this feature is known as the "Money Market Mutual Fund Overflow" or the "MMKT Overflow" component of the Bank Sweep program). Please see the FDIC-Insured Deposit Sweep Program Disclosure for more details.

### If You Utilize the Interest Bearing Option as Your Core Position

If you utilize the Interest Bearing option as your core position, the Intra-day Free Credit Balance, if any, as well as any After-hours Free Credit Balance generated by activity occurring prior to Fidelity's nightly processing cycle is automatically swept into your core account as part of that nightly cycle and held in the Interest Bearing option.

## Check and ACH Deposits

Each check or Automated Clearing House (ACH) deposit is promptly credited to your account. However, the money generally may not be available to use until up to six business days later (and at times even longer, for a period determined solely by Fidelity), and we may decline to honor any debit that is applied against the money before the deposited check or ACH has cleared. If a deposited check or ACH does not clear, the deposit will be removed from your account, and you are responsible for returning any interest you received on it. Note that we can only accept checks denominated in U.S. dollars and drawn on a U.S. bank account (including a U.S. branch of a foreign bank). We cannot accept third-party checks. In addition, if we have reason to believe that assets were incorrectly credited to your account, we may restrict such assets and/or return such assets to the account from which they were transferred.

## Debits to Your Account

Deferred debit card charges are debited monthly. All other debit items (including checks, debit card transactions, bill payments, securities purchases, electronic transfers of money, levies, court orders or other legal process payments) are paid daily to the extent that sufficient funds are available. Note that debits to resolve securities transactions (including margin calls) will be given priority over other debits, such as checks or debit card transactions.

As an account owner, you are responsible for satisfying all debits on your account, including any debit balance outstanding after all assets have been removed from an account, any margin interest (at prevailing margin rates) that has accrued on that debit and any costs (such as legal fees) that we incur in collecting the debit. You are also responsible for ensuring that checks issued to you representing distributions from your account are promptly presented for payment. If a check issued to you from your account remains uncashed and outstanding for at least six months, you authorize and instruct Fidelity, in its sole discretion, to cancel the check and return the underlying proceeds to you by depositing the proceeds into your account.

To help ensure the proper discharge of debits, it is our policy (unless we agree to do otherwise) to do the following when settling debits against your account.

### If You Utilize a Fidelity Money Market Fund as Your Core Position

If you utilize a Fidelity money market fund as your core position and there are debits in your account generated by account activity occurring prior to the market close each business day (or 4 p.m. Eastern time on business days when the market is closed and the Fedwire Funds Service is operating), these debits will be settled at the market close using the following sources, in this order:

- any Intra-day Free Credit Balances
- redemption proceeds from the sale of your core position at the market close
- redemption proceeds from the sale of any shares of a Fidelity money market mutual fund held in the account that maintains a stable (i.e., $1.00/share) net asset value and is not subject to a liquidity fee or similar fee or assessment
- if you have a margin account, any margin surplus available, which will increase your margin balance

There will be additional sweeps early in the morning prior to the start of business on each business day, and certain unsettled debits in your account along with debits associated with certain actual or anticipated transactions that would otherwise generate a debit in your account during the business day will be settled using redemption proceeds from the sale of your core position early in the morning prior to the start of business.

### If You Utilize the Bank Sweep as Your Core Position

If you utilize the Bank Sweep as your core position and there are debits in your account generated by account activity occurring prior to Fidelity's nightly processing cycle, these debits will be settled using the following sources, in this order:

- any Intra-day or After-hours Free Credit Balances
- proceeds from the sale of any shares of the MMKT Overflow held in the core account
- proceeds from the withdrawal of Program Deposits occurring on the next business day (not including bank holidays or days on which the New York Stock Exchange is closed, such as Good Friday)
- redemption proceeds from the sale of any shares of a Fidelity money market mutual fund held in the account that maintains a stable (i.e., $1.00/share) net asset value and is not subject to a liquidity fee or similar fee or assessment
- if you have a margin account, any margin surplus available, which will increase your margin balance

In addition, early in the morning prior to the start of business on each business day, certain unsettled debits in your account along with debits associated with certain actual or anticipated transactions that would otherwise generate a debit in your account during the business day will be settled using proceeds from the withdrawal of Program Deposits occurring that business day (not including bank holidays or days on which the New York Stock Exchange is closed, such as Good Friday). Debits associated with certain actual or anticipated transactions that would otherwise generate a debit in your account during the business day will be settled using proceeds first from the sale of any shares of the MMKT Overflow and then the withdrawal of Program Deposits occurring that business day.

### If You Utilize the Interest Bearing Option as Your Core Position

If you utilize the Interest Bearing option as your core position and there are debits in your account generated by account activity occurring prior to Fidelity's nightly processing cycle, these debits will be settled using the following sources, in this order:

- any Intra-day or After-hours Free Credit Balances
- funds held in the Interest Bearing option
- redemption proceeds from the sale of any shares of a Fidelity money market mutual fund held in the account that maintains a stable (i.e., $1.00/share) net asset value and is not subject to a liquidity fee or similar fee or assessment
- if you have a margin account, any margin surplus available, which will increase your margin balance

In addition to the foregoing, we may turn to the following sources:

- redemption proceeds from the sale of any shares of a Fidelity money market fund held in another non-retirement account with the same registration (which you authorize us to sell for this purpose when you sign the application)
- any securities in any other account at Fidelity in which you have an interest

If you want to opt out of the foregoing, please contact Fidelity for more information.

In the event that your account does not contain sufficient cash, Fidelity may liquidate securities to satisfy a court order, levy, or any other legal process payment.

### Resolving Unpaid Obligations or Other Obligations

If certain of the sources listed above in "Debits to Your Account" (which are defined as your "available balance" for purposes of this Agreement) are not enough to satisfy a given debit, we reserve the right to take action as we see fit, including declining to honor the debit, which may result in fees (such as a returned check fee) or other consequences for you.

Note that at any time, we may reduce your available balance to cover obligations that have occurred but not yet been debited including but not limited to withholding taxes that should have been deducted from your account.

It is important to understand that we do have additional choices for resolving unsatisfied obligations. Like many other securities brokers, we reserve the right to sell or otherwise use assets in an account to discharge any obligations the account owner(s) may have to us (including unmatured and contingent obligations), and to do so without further notice or demand. For example, if you have bought securities but not paid for them, we may sell them ourselves and use the proceeds to settle the purchase.

Although Fidelity may use other methods, Fidelity reserves the right to use the provisions described in this section at any time, except when they would conflict with the Employee Retirement Income Security Act of 1974 (ERISA) or the Internal Revenue Code of 1986, both as amended.

### Transaction Settlement Deadlines

Generally, you need to pay for all transactions or deliver all securities by 2 p.m. Eastern time on the settlement date. We reserve the right to cancel or liquidate, at your risk, any transaction not settled in a timely way.

### Transfer of Securities — Dividends

When dividends are paid on securities that are transferred from a brokerage account (other than in settlement of brokerage transactions), such as transfers between accounts and gifts of securities, Fidelity will apply the same "ex-dividend date" rules that apply to brokerage transactions so that transfers before an ex-dividend date will transfer the dividend to the transferee, and transfers on or after the ex-dividend date will not transfer the dividend to the transferee.

### Nontransferable Securities

In the event that any securities in your account become nontransferable, NFS may remove them from your account without prior notice. Nontransferable securities are those where transfer agent services have not been available for six or more years. A lack of transfer agent services may be due to a number of reasons, including that the issuer of such securities may no longer be in business and may even be insolvent. NFS may remove nontransferable securities from your account pursuant to a Securities and Exchange Commission–approved program that permits our custodian for these securities to no longer maintain the physical certificates representing the positions in these securities. Please note the following:

- There are no known markets for these securities
- We are unable to deliver certificates to you representing these positions
- These transactions will not appear on Form 1099 or any other tax-reporting form
- If the position is held in a retirement account, we will not report the removal of the position as a taxable distribution and any reinstatement of the position will not be reported as a contribution
- If transfer agent services become available sometime in the future, NFS will use its best efforts to have the position reinstated in your account
- Positions removed from your account will appear on your next available account statement following such removal as an "Expired" transaction

By opening and maintaining an account with us, you consent to our actions as we have described them above, and you waive any claims against us arising out of such actions. You also understand that we do not provide tax advice concerning your account or any securities that may be the subject of removal from or reinstatement into your account, and you agree to consult with your own tax advisor concerning any tax implications that may arise as a result of any of these circumstances. Fidelity has no responsibility for determining if the sale of either a limited partnership or master limited partnership would generate unrelated business taxable income in your IRA or whether a specific securities transaction you have made would be deemed a prohibited transaction under ERISA and §4975 of the Internal Revenue Code.

### If You Transfer Money to a Fidelity Crypto® IRA ("Crypto Account")

When you transfer money from your account to a linked Crypto Account, you authorize Fidelity to debit your account for the applicable amount and transfer it to Fidelity Digital Assets®. Additionally, when you transfer sales proceeds from a linked Crypto Account to your account, you authorize Fidelity to accept a credit into your account from Fidelity Digital Assets®. Crypto Accounts are governed by the Fidelity Crypto® IRA Customer Agreement ("Crypto Agreement"). Neither FBS nor NFS acts as your agent, receives, acquires or holds any of your digital assets, nor is otherwise responsible for transactions in your Crypto Account with Fidelity Digital Assets®. Please read the Crypto Agreement carefully to understand the terms of your relationship with Fidelity Digital Assets®.

## Policies on Optional Features

### EFT Transactions

EFT transactions are normally completed within three to seven business days of your request. However, the money generally may not be available to use until up to six business days later (and at times even longer, for a period determined solely by Fidelity), and we may decline to honor any debit that is applied against the money before the EFT has cleared. An EFT transfer may be from $10 to $99,999. The two accounts involved in

an EFT transaction must have at least one owner's name in common (and that name must match exactly). To send and receive EFT transactions, your bank must be a member of the Automated Clearing House (ACH) system.

For EFT transactions, you hereby grant us limited power of attorney for purposes of redeeming any shares in your accounts (with the right to make any necessary substitutions), and direct us to accept any orders to make payments to an authorized bank account and to fulfill these orders through the redemption of shares in your account. You agree that the above appointments and authorizations will continue until we receive written notice of any change at the address listed following "Things to Know Before Using Your Account," although we may cease to act as agents to the above appointments on 30 days' written notice to your account's address of record. You further understand that Fidelity may notify you electronically or by phone when the EFT feature is set up or EFT transactions are initiated on your account.

If you have arranged to have direct deposits made to your account, at least once every 60 days from the same person or company, you can call Fidelity at 800-343-3548 to find out whether or not the deposit has been made.

### Dividend Reinvestment Program

With this feature, all dividends paid by eligible securities that you designate for reinvestment are automatically reinvested in additional shares of the same security. (For purposes of the Dividend Reinvestment Program, "dividends" means cash dividends and capital gain distributions, late ex-dividend payments, and special dividend payments, but not cash-in-lieu payments.) In designating any eligible security for reinvestment, you authorize us to purchase shares of that security for your account. Eligible securities may be enrolled or withdrawn from the Dividend Reinvestment Program online or with the assistance of a representative.

To be eligible for this feature, a security must satisfy all of the following:

- be a closed-end fund, common stock, or foreign security (generally American depository receipts [ADRs])
- be margin-eligible (as defined by NFS)
- be held in street name by NFS (or at a securities depository on its behalf)
- not be held as a short position

Dividends are reinvested on shares that satisfy all of the following:

- the security is eligible
- you own the shares on the dividend record date
- you own the shares on the dividend payable date (even if you sell them that day)
- your position in the security has been settled on or before the dividend record date
- the shares are designated for reinvestment as of 9 p.m. Eastern time on the dividend record date

Shares purchased through the Dividend Reinvestment Program will generally be placed in your account as of the dividend payable date. Note, however, that the stock price at which your reinvestment occurs is not necessarily the same as the price that is in effect on the dividend payable date. This is because we generally buy the shares of domestic companies one business day before the dividend payable date, at the market price(s) in effect at the time, in order to help ensure that we have shares on hand to place in your account on the dividend payable date. Other factors may require the purchase of the shares on a different business day, which may be before, on, or after the dividend payable date, e.g., dividends of foreign companies. Also, shares of securities that have an irregular ex-dividend date are purchased on the ex-dividend date and placed in your account on the first business day following the ex-dividend date. Therefore, you may end up receiving more or fewer shares than if your dividend had been reinvested on the dividend payable date itself, particularly if there are significant changes in the market price of a security just before its dividend payable date. If several purchase transactions are necessary to reinvest your and other customers' dividends in a particular security, the price per share will be the weighted average price per share for all shares purchased. If sufficient shares are unavailable in the market to satisfy all customers' requirements for dividend reinvestment for a security, the dividend will not be reinvested. The reinvestment of dividends may be delayed in certain circumstances. NFS reserves the right to suspend or completely remove securities from participation in dividend reinvestment and credit such dividends in cash at any time without notice.

Automatic reinvestments often involve purchase of fractional shares, calculated to three decimal places. Partial shares pay prorated dividends and can be sold if you are enrolled in Fractional Trading or if you sell your entire share position, and will be liquidated automatically in transfers and certain other situations.

Although for dividend reinvestments your regular account statement takes the place of a trade confirmation, you can generally obtain status information the day after the reinvestment date by contacting Fidelity.

If you transfer or reregister your account within Fidelity (for example, by changing from a traditional IRA to a Roth IRA), you need to redesignate any securities whose dividends you want reinvested. You will be notified in advance of any material changes to the Dividend Reinvestment Program.

### DTC's Dividend Reinvestment Program

For certain securities, dividend reinvestment may occur through DTC's (Depository Trust Company) dividend reinvestment program (DRP). This plan may be utilized if an issuer offers reinvestment at a discount. Eligibility for a security to be enrolled in the DRP or the Fidelity dividend reinvestment program is determined by Fidelity and may change without notice. A DRP transaction will post to your account when the shares are made available to Fidelity by DTC. Such transactions are generally posted within 15 days after pay date.

Note that dividend reinvestment does not ensure a profit on your investments and does not protect against loss in declining markets. If you sell your dividend-generating shares before the posting date, the dividend will not be reinvested.

### Optional Dividends

At times, certain issuers that pay dividends may offer shareholders an opportunity to elect to receive stock or cash, or a combination of both. This is known as an "Optional Dividend." The issuer will assign a default if no instruction is received. For example, the default option could be cash, stock, or a combination of both. You have the opportunity up until the applicable deadline to make an election to receive the payment of your choice. Please be advised, if you do not make an election prior to the deadline, your account will be assigned a default election based on the dividend reinvestment program instructions you established with respect to your account. **This default election will be utilized in lieu of the issuer's default option being applied to your account.**

## Fractional Share Trading

Fidelity's fractional share trading functionality allows you to buy and sell fractional share quantities and dollar amounts of certain securities ("Fractional Trading"). Fractional Trading presents unique risks and has certain limitations that you should understand before placing your first trade.

### Trading

Orders to buy or sell may be entered using either a fractional share quantity (e.g., 2.525 shares) or a dollar value (e.g., $250.00). Share quantities can be specified to three decimal places (.001). Dollar-value orders will be converted into share quantities for execution, again, to three decimal places. In all cases, when converting dollar-value orders into share quantities, the share quantities will be rounded down.

For a variety of reasons, including but not limited to this conversion convention, the actual amount of an executed dollar-value trade may be different from the requested amount. The actual amount of an executed order to buy or sell a dollar value of a security may also be lower than the amount requested due to the deduction of certain fees (e.g., the Additional Assessment) or taxes.

Orders received in good form by FBS will be accepted and transmitted to NFS for execution. You may attempt to cancel an order, but there is no ability to request that an order be "cancelled and replaced" (i.e., you cannot modify an order once it has been submitted). Instead, you will need to cancel your order and then submit a new one.

Fractional Trading supports market and limit orders only for fractional share quantities of a security that are good for that day's trading session, or in the case of an order entered outside of market hours, that are good until the close of the next trading session. Because of this, your ability to buy or sell a security using Fractional Trading may be more restricted than if you were to buy or sell traditional whole share quantities of the same security.

In the event of a trading halt of a security, Fractional Trading of that security will also be halted, and your order will be held until trading resumes. However, your order is good only for that day's trading session, or in the case of an order entered outside of market hours, good until the close of the next trading session. If trading does not resume or your order is not executed by the close of that day's Fractional Trading window, it will be cancelled.

You can generally trade exchange-listed National Market System ("NMS") stocks using the Fractional Trading functionality. However, certain NMS stocks may not be made available for Fractional Trading, and Fidelity reserves the right to modify the list of eligible NMS stocks at any time without notice to you. Any modification to the list of eligible NMS stocks available for Fractional Trading will not affect any fractional share interests previously acquired by you. In certain limited circumstances, you may also be able to sell a fractional share interest in a security that is no longer an NMS stock, provided that it was an NMS stock at the time you purchased it and your fractional interest was acquired using the Fractional Trading functionality. Additionally, you may not be able to place trades through some of Fidelity's order entry platforms.

## Trade Execution

FBS will act as your agent and NFS will act in either a principal, riskless principal or a mixed principal or a mixed capacity (i.e., both as agent and principal) when executing your order. The whole share component of any order will be executed by NFS as agent at the price NFS receives in the market. The fractional share component of any order will be executed by NFS as principal or riskless principal against its principal account. When a fractional share interest is allocated to your account, NFS will maintain custody of the whole share in which you have the fractional interest. Any fractional share interest in the whole share not allocated to your account may be allocated to other customers or to NFS as principal.

All orders with a fractional share component will be marked "Not Held," which gives Fidelity the time and price discretion to execute the order without being held to the security's current quote. As a result, each time you submit an order to buy or sell a fractional share quantity or dollar amount of a particular security, you authorize NFS to "work the order." If you do not wish your order to be handled on a Not Held basis, you should not engage in Fractional Trading.

In the case of a sale of the fractional component of any order, that sale will be executed at or inside the then current National Best Bid or Offer ("NBBO"). Please note that this price may be higher or lower than the price at the time you place your order. In the case of a purchase of the fractional component of any order, if NFS has sufficient principal inventory, that purchase will also be executed at the then current NBBO. However, if NFS does not have sufficient principal inventory, that purchase will be executed at the price received in the market. For orders placed prior to market open, Fidelity may wait for the primary exchange to open before commencing trading in a particular security. When trading as principal for its own account, NFS may make a profit or incur a loss on each trade.

Additionally, NFS may be required to correct or adjust trades that (for a variety of reasons) have been executed in amounts that either exceed or fall short of the amounts requested. These trade corrections and adjustments could arise in connection with either or both of the agency and principal components of the executed orders. Regardless, these trade corrections and adjustments will be executed by NFS in a principal capacity, and when trading as principal for its own account, NFS may make a profit or incur a loss.

## Shareholder Rights

Fractional share interests in an NMS security generally have different rights from full share interests of the same NMS security. Please read the following information carefully to understand your rights regarding your fractional share interests.

Fractional share positions cannot be transferred or certificated. The Automated Customer Account Transfer System does not support fractional share positions. If you want to transfer your account or specific share positions to another broker, you must sell your fractional positions and transfer the cash proceeds.

You hereby direct NFS, and NFS hereby agrees, not to vote or take any discretionary or voluntary action with respect to any fractional share position. Furthermore, you acknowledge that you cannot vote or take any discretionary or voluntary action with respect to any fractional share position. Accordingly, while NFS may notify you of issuer meetings, NFS will not solicit proxies in connection with fractional share positions, and you cannot vote proxies for fractional share positions. Fractional shareholders will not be able to provide instruction in connection with voluntary corporate actions (e.g., tenders), except for optional dividends; and NFS will not vote proxies for any fractional shares it holds as principal and will not affirmatively participate in any voluntary corporate actions.

In the case of a dividend paid on, or a redemption of, an NMS security, the dividend or redemption proceeds will be passed along to you in proportion to your ownership interest, inclusive of fractional share interests. NFS will only support payments that are equal to or greater than $0.01 per share. Amounts smaller than that, or nondivisible amounts (based on the .001 rounding convention described above), will be handled in accordance with the process described in the section titled "Undistributable Interests" below.

Holders of fractional share positions may participate in dividend reinvestment programs ("DRIPs") to the same extent as if they owned a full share (adjusted for their fractional share interest in the dividend). In the event that the amount is too small to be reinvested (based on the .001 rounding convention described above), but large enough to be distributed as cash (i.e., at least $0.01), it will be paid to you. Smaller amounts will be handled in accordance with the process described in the section titled "Undistributable Interests" below.

For mandatory reorganizations, such as mergers and acquisitions, or other involuntary corporate actions, such as stock splits or stock dividends, typically NFS will distribute interests in proportion to your ownership interest, inclusive of fractional share interests. NFS will distribute interests in fractional amounts to three decimal places. Amounts smaller than that, or nondivisible amounts, will be handled in accordance with the process described in the section titled "Undistributable Interests" below. The foregoing notwithstanding, these situations are in all cases subject to the terms contained in the materials prepared by the issuer describing the corporate action, as well as NFS's applicable policies and procedures, which may result in a different outcome from what is described herein.

Because of the unpredictable nature of corporate actions, there may be situations that arise that are not described previously. Generally, these situations will be handled in accordance with the concepts applicable to dividends and reorganizations. Interests will be divided and distributed where possible in proportion to your ownership interest, and anything that cannot be divided will be handled in accordance with the process described in the section titled "Undistributable Interests" below. The foregoing notwithstanding, these situations are in all cases subject to the terms contained in the materials prepared by the issuer describing the corporate action, as well as NFS's applicable policies and procedures, which may result in a different outcome from what is described above.

## Undistributable Interests

NFS will only support payments that are equal to or greater than $0.01 per share. Amounts smaller than that, or nondivisible amounts (based on the .001 rounding convention described above), will not be distributed. Instead, it is generally but not always the case that when the aggregate value to be distributed is less than or equal to $1.00, it will be retained by NFS, and when it exceeds $1.00, it will be escheated.

## Tax Treatment

NFS and you agree to treat you as the owner of all fractional share interests allocated to your account, to file all tax returns in accordance with such treatment, and to take no action inconsistent with such treatment.

## Trading in Volatile Markets — Understand the Risks

Volatile markets can present higher trading risks. Ways to manage some of these risks include:

- **Consider placing limit orders instead of market orders** In certain market conditions or with certain types of volatile securities, price changes may be significant and rapid during regular or after-hours trading. In these cases, placing a market order could result in a transaction that exceeds your available funds, meaning that Fidelity would have the right to sell other assets in your account. This is especially a risk in accounts that you cannot easily add money to, such as retirement accounts.
- **Be aware that quotes, order executions, and execution reports could be delayed** During periods of heavy trading or volatility, quotes that are provided as "real time" may be stale — even if they appear not to be — and you may not receive every quote update. Security prices can change dramatically during such delays, and order execution may be delayed or unavailable.
- **If you attempt to cancel an order, understand that there is no guarantee that an open order can be cancelled in whole or in part** If you wish to replace an order you have attempted to cancel, be sure your original order is actually cancelled. Don't rely on a receipt for your cancellation order; that order may have arrived too late for us to act on.
- **Use other ways to access Fidelity during peak volume times** Phone or computer capacity limitations could mean delays in getting information or placing orders. If you are having problems with one method, try another.

The chances of encountering these risks are higher for individuals using day-trading strategies. In part for this reason, Fidelity does not promote day-trading strategies.

For more information on trading risks and how to manage them, visit Fidelity.com or contact Fidelity.

### Additional Considerations

Fractional share positions may be illiquid. NFS does not guarantee that there will be a market for fractional share positions and makes no representations or warranties about its ability or willingness to continue to trade as principal in fractional share quantities.

If your account is closed, your fractional shares may be liquidated and the proceeds distributed to you as cash.

The fractional share component of certain orders may not be eligible for "Price Improvement." Also, Price Improvement will operate differently, and in some situations less advantageously, in connection with Fractional Trading from the way it would if you were trading in whole share quantities. Additionally, because in certain situations Price Improvement on the fractional share component of an order will affect the execution price rather than the share quantity of an order, the effect of the improvement on a dollar-value order in those situations will be to increase or decrease the value of the order outside of what was requested.

If your account has been approved for margin, notwithstanding the terms of the Customer Agreement, Fidelity will not lend (hypothecate) your fractional share positions.

If you hold fractional share positions in your account (these positions come about for a variety of reasons, such as DRIPs or corporate actions), it has been Fidelity's practice to automatically sell these holdings when you place an order to sell or transfer your entire whole share position. Fidelity will enter a market order to sell the residual fractional shares on the business day following the sell or transfer of the whole shares. The execution price you receive may be higher or lower than the price received for the whole shares. Liquidation details will be available on customer statements. Once the fractional share positions are automatically sold or after the first time you place an order to buy or sell a security using the Fractional Trading functionality, we will turn off the auto-sell feature in your account so that going forward, you will need to handle those positions like any other fractional share position acquired using Fractional Trading (i.e., you will need to affirmatively sell those fractional share positions if you wish to sell your entire position in that security).

## Fractional New Issue Certificates of Deposit

Fidelity's fractional CD functionality allows you to buy fractional quantities of certain new issue CDs ("Fractional CDs") in certain incremental amounts (such as $100, although this amount may vary over time). There are certain limitations that you should understand before investing in Fractional CDs. Fractional CDs are intended to be held until maturity due to the illiquid nature of CDs in general. However, should you need to liquidate a fractional CD, you will need to obtain a bid for the fractional portion of your CD. Due to the limited market for fractional CDs, FBS will request a bid from NFS only. NFS does not guarantee that there will be a market for fractional CDs. Orders to sell fractional CDs may only be requested in the amount that was originally purchased as a fractional CD. You will not be able to sell a fractional portion of a CD that was purchased as a whole CD.

### Transfer of Fractional Positions

The Automated Customer Account Transfer System does not support fractional positions. If you want to transfer your account or specific share positions to another broker, you must sell your fractional positions and transfer the cash proceeds.

### Undistributable Interests

NFS will only support payments that are equal to or greater than $0.01 per share. Amounts smaller than that, or nondivisible amounts, will not be distributed.

### Tax Treatment

NFS and you agree to treat you as the owner of all fractional CD interests allocated to your account, to file all tax returns in accordance with such treatment, and to take no action inconsistent with such treatment.

### Additional Considerations

Fractional positions may be illiquid. NFS does not guarantee that there will be a market for fractional positions and makes no representations or warranties about its ability or willingness to continue to trade as principal in fractional quantities. If your account is closed, your fractional position may be liquidated and the proceeds distributed to you as cash.

## Precious Metals

In general, precious metals and other collectibles within the meaning of Section 408(m) of the Internal Revenue Code may not generally be purchased in an IRA or other retirement account except as otherwise permitted under ERISA and the Internal Revenue Code, as applicable, and to the extent permitted by Fidelity. To the extent that collectibles, including precious metals, are held in an underlying trust or other investment vehicle such as an exchange-traded fund, it is your responsibility to determine whether or not such an investment is appropriate for an IRA or retirement plan account and whether the acquisition of such investment may result in a taxable distribution from such account under Section 408(m).

Precious metals are not covered by SIPC account protection, but are insured by the depository at market value if stored through us. When trading precious metals, note that because they can experience sudden and rapid price changes, they are risky as investments, and we cannot guarantee you an advantageous price when you trade them.

If you store precious metals through us, storage fees will apply.

## Closing Your Account

We can close your account, or terminate any optional feature, at any time, for any reason, and without prior notice. You can close your account, or terminate any optional feature, by notifying us in writing or calling us on a recorded line. We may automatically close accounts with zero balances. Regardless of how or when your account is closed, you will remain responsible for all charges, debit items, or other transactions you initiated or authorized, whether arising before or after termination. Note that a final disbursement of assets may be delayed until any remaining issues have been resolved.

## Monitoring Your Account and Notifying Us of Errors

As an account owner, you are responsible for monitoring your account. This includes making sure that you are receiving transaction confirmations, account statements, and any other expected communications. It also includes reviewing these documents to see that information about your account is accurate and contains nothing suspicious. Please note that, unless we have otherwise contractually agreed to do so, we do not have an ongoing responsibility to monitor an investment strategy, account type, or securities bought, sold, or held in your account, even in cases where we have made a recommendation.

Note that so long as we send communications to you at the physical or electronic address of record given on the application, or to any other address given to us by you or any other authorized person, the communications are legally presumed to have been delivered, whether you actually received them or not. In addition, confirmations and statements are legally presumed to be accurate unless you specifically tell us otherwise.

If you have not received a communication you expected, or if you have a question or believe you have found an error in any communication from us, telephone us immediately, then follow up with written confirmation (see contact information following "Things to Know Before Using Your Account").

You agree to notify us immediately if:

- you placed an order electronically but did not receive a reference number for it (an electronic order is not considered received until we have issued an acknowledgment)
- you received confirmation of an order you did not place, or any similar conflicting report
- there is any other type of discrepancy or suspicious or unexplained occurrence relating to your account
- your password or access device is lost or stolen, or you believe someone has been using it without authorization

If any of these conditions occurs and you fail to notify us immediately, neither we nor any other Fidelity affiliate will be liable for any consequences. If you do immediately notify us, our liability is limited as described in this Agreement.

With any feature or service that is governed by a separate agreement (such as an options trading agreement), note that different policies concerning error resolution and liability may apply, as described in the separate agreement. Nothing in this agreement alters or supersedes any rights or protections that might be provided to you under Regulation E.

If, through any error, you have received property that is not rightfully yours, you agree to notify us and to immediately return the property and any earnings it may have yielded.

If we identify an error in connection with property you have received from or through us or a Fidelity affiliate and determine it is not rightfully yours, you agree that we may take action to correct the error, which may include returning such property to the rightful owner.

## Complying with Applicable Laws and Regulations

In keeping with federal and state laws, and with securities industry regulations, you agree to notify us in writing if any of the following occur (with all terms in quotes defined as being within the meaning of the Securities Act of 1933):

- if you (or an authorized person on your account) are, or later become, an employee or other "associated person" of a stock exchange, a member firm of an exchange or the Financial Industry Regulatory Authority (FINRA), a municipal securities dealer, or Fidelity or any Fidelity "affiliate"
- if you are, or later become, an "affiliate" or "control person" with respect to any security held in your account
- if any transactions in your account regarding securities whose resale, transfer, delivery, or negotiation must be reported under state or federal laws

You also agree:

- if you (or an authorized person on your account) are, or later become, an "associated person" of a member firm of an exchange or FINRA, that you have obtained consent of the "employer member," and you authorize Fidelity upon request by an employer member to transmit copies of confirmations and statements, or the transactional data contained therein, with respect to all of your accounts, including all accounts subject to FINRA rules and unit investment trusts, municipal fund securities, and qualified programs pursuant to Section 529 of the Internal Revenue Code.
- to ensure that your account transactions comply with all applicable laws and regulations, understanding that any transaction subject to special conditions may be delayed until those conditions are met
- to comply with all policies and procedures concerning "restricted" and "control" securities that we may require
- to comply with any insider trading policies that may apply to you as an employee or "affiliate" of the issuer of a security

If you or another individual associated with your account resides outside the U.S., Fidelity may at any time in its sole discretion terminate that relationship or modify your rights to access any or all account features, products, or services. By opening or maintaining an account with Fidelity, you acknowledge that Fidelity does not solicit offers to buy or sell securities, or any other product or service, to any person in any jurisdiction where such offer, solicitation, purchase, or sale would be unlawful under the laws of such jurisdiction.

## Limits to Our Responsibility

Although we strive to ensure the quality and reliability of our services, including electronic services (such as online, wireless, and automated telephone services), neither we nor any third party whose services we arrange for are responsible for the availability, accuracy, timeliness, completeness, or security of any service related to your account.

You therefore agree that we are not responsible for any losses you incur (meaning claims, damages, actions, demands, investment losses, or other losses, as well as any costs, charges, attorneys' fees, or other fees and expenses) as a result of any of the following:

- cancellation of an accepted trade in which Fidelity reasonably determines, in its sole discretion, that there was a data, clerical or other similar error in the handling or processing of the trade, including but not limited to a situation where a third party caused such error
- the acceptance and processing of any order placed on your account, whether received electronically or through other means, as long as the order reasonably appears to be authentic; or the refusal to accept or execute any order, instruction, or transfer as Fidelity may elect to do at any time
- cancellation of an accepted/executed trade when dealers and/or contra-parties notify Fidelity that they are unable to deliver the bonds because the order was filled in error
- investment decisions or instructions placed on your account, or other such actions attributable to you or any authorized person
- occurrences related to governments or markets, such as restrictions, suspensions of trading, or high market volatility or trading volumes
- uncontrollable circumstances in the world at large, such as wars, natural disasters, power outages, unusual weather conditions, or government restrictions
- occurrences related to computers and communications, such as a network or systems failure, a message interception, or an instance of unauthorized access or breach of security

- with respect to electronically provided market data or other information provided by third parties, any flaw in the timing, transmission, receipt, or substance (such as any inaccuracy, error, delay, omission, or sequence error, any nonperformance, or any interruption of information), regardless of who or what has caused it to occur
- the storage and use of information about you and your account(s) by our systems and transmission of this information between you and us; these activities occur entirely at your risk
- the usage of information received by you or us through any electronic services
- telephone requests for redemptions, so long as we transmit the proceeds to you or the bank account number identified
- difficulties receiving information or accessing your account that are due to the equipment you use, including difficulties resulting from technical incompatibilities, malfunctions, inherent limitations, or interruptions in service
- any checks or other debits to your account that are not honored because the account has insufficient funds

**If any service failure is determined to be our responsibility, we will be liable only for whatever direct benefit you would have realized up to the time by which you should have notified us, as specified earlier in "Monitoring Your Account and Notifying Us of Errors." Fidelity reserves the right to restrict your account from withdrawals and/or trades if there is a reasonable suspicion of fraud, diminished capacity, or inappropriate activity. Fidelity also reserves the right to restrict your account from withdrawals and/or trades if Fidelity is put on reasonable notice that the ownership of some or all of the assets in the account is in dispute.**

## Indemnification

You agree to indemnify us from, and hold us harmless for, any losses (as defined in "Limits to Our Responsibility") resulting from your actions or failures to act, whether intentional or not, including losses resulting from actions taken by third parties.

If you use any third-party services or devices in connection with your account (such as Internet service or wireless devices), all service agreements and payments for these are your responsibility. Rates and terms are set by the service providers and are not Fidelity's responsibility.

Note that beyond taking reasonable steps to verify the authenticity of instructions, we have no obligation to inquire into the purpose, wisdom, or propriety of any instruction we receive.

## Terms Concerning This Agreement

### Applicability

This Agreement is the only agreement between you and us concerning its subject matter, and covers all accounts that you, at whatever time, open, reopen, or have opened with us. In addition, if you have already entered into any agreements concerning services or features that relate to this account (such as the usage agreement or Terms of Use for Fidelity.com, accessible on the footer on Fidelity.com), or if you do so in the future, this Agreement incorporates by reference the terms, conditions, and policies of those agreements. In the case of any conflict between this Agreement and an agreement for a particular service or feature, the service or feature agreement will prevail.

### Governing Laws and Policies

**This Agreement and its enforcement are governed by the laws of the Commonwealth of Massachusetts, except with respect to its conflicts-of-law provisions.**

All transactions through Fidelity are subject to the rules and customs of the marketplace where they are executed, as well as to applicable state and federal laws. In addition, the services below are subject to the following laws and policies:

- Securities trades: any Fidelity trading policies and limitations that are in effect at the time
- Online services: the license or usage terms posted online
- Checkwriting: the applicable provisions of the Uniform Commercial Code and the terms governing the service

### Modification and Enforcement

We may amend or terminate this Agreement at any time. This may include changing, dropping, or adding fees and policies; changing features and services or the entities that provide them (such as the bank that provides checkwriting); and limiting the usage or availability of any feature or service, within the limits of applicable laws and regulations. Although it is our policy to send notice to account owners of any material changes, we are not obligated to do so in most cases. Apart from changes originating in these ways, no provision of this Agreement can be amended or waived except in writing by an authorized representative of Fidelity.

Fidelity may transfer its interests in this account or Agreement to any of its successors and assigns, whether by merger, consolidation, or otherwise. You may not transfer your interests in your account or Agreement (including de facto transferal by giving a nonowner access to the account using a password) except with the prior written approval of Fidelity, or through inheritance, divorce, or similar circumstance, as allowed by law, in which case any rights and obligations in existence at the time will accrue to, and be binding on, your heirs, executors, administrators, successors, or assigns.

We may enforce this Agreement against any and all account owners. In addition, any securities exchanges or associations that provide information to you through your account may enforce the terms of this Agreement directly against you. Although we may not always enforce certain provisions of this Agreement, we retain our full right to do so at any time.

If any provision of this Agreement is found to be in conflict with applicable laws, rules, or regulations, either present or future, that provision will be enforced to the maximum extent allowable, or made to conform, as the case may be. However, the remainder of this Agreement will remain fully in effect.

Fidelity may use the electronically stored copy of your (or your agent's) signature, any written instructions or authorization, the account application and this Agreement as the true, complete, valid, authentic, and enforceable record, admissible in judicial, administrative, or arbitration proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. You agree to not contest the admissibility or enforceability of the electronically stored copies of such documents in any proceeding between you and Fidelity.

# Disclosures

### Consumer Reporting Agencies

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

We may also provide information about you and your account as well as the activity in your account to one or more consumer reporting agencies. If you believe that information Fidelity has provided about you or your account or the activity in your account is not accurate, you may notify us at:

Fidelity Investments
Attn: Customer Data Disputes
PO Box 770001
Cincinnati, OH 45277-0045

In order for us to investigate any dispute that you may submit to us with respect to information that we have provided, please provide us with the following information:

(1) Your name, address, and account number;

(2) An identification of the specific information that you believe is not accurate; and

(3) An explanation of the basis for your dispute.

### Service Providers

Retirement brokerage services are provided by NFS, an affiliate of FBS. Bonds may be traded through NFS (which may choose to act as principal or agent) or through external dealers. Services available through this account are the property of Fidelity or the third parties from which Fidelity has obtained rights. Market data provided by national securities exchanges or associations remain the property of those entities.

### Routing of Orders

FBS routes most customer orders to its affiliated broker-dealer, NFS, which in turn sends orders to various exchanges or market centers for execution. In deciding where to send an order, NFS looks at a number of factors, such as size of order, trading characteristics of the security, favorable execution prices (including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing, and execution cost. Some market centers may execute orders at prices superior to publicly quoted market prices. Although you can instruct us to send an order to a particular marketplace, our standard order-routing policies are designed to result in transaction processing that is favorable for you. NFS reserves the right to wait for the primary exchange to open before commencing trading in a particular security. If Fidelity, in its sole discretion, determines that your trading activity negatively impacts our ability to provide price improvement opportunities to other customers or is otherwise disruptive to the price improvement program, we reserve the right, without notice, to restrict and/or limit your participation in the price improvement program and/or change the routing of your orders.

### Conflicts of Interest and Compensation

Fidelity and its affiliates receive fees for providing certain products and services. Below is a partial list of affiliates, and the services they are paid for:

- Fidelity Management & Research Company — fee for serving as an investment adviser to the Fidelity funds.
- FBS, NFS, or their affiliates may receive compensation in connection with the purchase and/or ongoing maintenance of positions in certain mutual funds in your account. FBS, NFS, or their affiliates may also receive compensation for such things as systems development necessary to establish a fund on their systems, a fund's attendance at events for FBS' clients, and/or representatives and opportunities for the fund to promote its products and services. This compensation may take the form of sales loads and 12b-1 fees described in the prospectus; marketing, engagement, and analytics program participation fees; maintenance fees; start-up fees; and platform support paid by the fund, its investment advisor, or an affiliate.
- FBS and/or NFS receives remuneration, compensation, or other consideration (such as financial credits or reciprocal business) for directing orders in certain securities to particular broker-dealers or market centers for execution. Information about the source(s) and amount(s) of compensation as well as other remuneration received by FBS and/or NFS and other affiliates is also more fully described in the FBS Form CRS and the Products, Services, and Conflicts of Interest disclosure document, available online at Fidelity.com/Reg-BI-Master-Disclosure and information about the foregoing is also available upon written request.

## Warranty Disclaimer

**Neither we nor any third party makes any representations or warranties express or implied, including, without limitation, any implied warranties of merchantability or fitness for a particular purpose in respect of any services provided in connection with this account, or any information programs or products obtained from, through, or in connection with these services. In no event will we or any third party be liable for direct, indirect, incidental, or consequential damages resulting from any defect in or use of these services.**

## Money Market Fund Investments

***You could lose money by investing in a money market fund. Although the fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the fund is not a bank account and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. Fidelity Investments and its affiliates, the fund's sponsor, is not required to reimburse money market funds for losses, and you should not expect that the sponsor will provide financial support to the fund at any time, including during periods of market stress.***

Fidelity's government and U.S. Treasury money market funds will not impose a fee upon the sale of your shares.

## Texas House Bill 1454 "Designated Representative"

For Texas residents (or those using a Texas address as a legal address), under Texas House Bill 1454 Act No. 350, you, as an account owner of shares of a mutual fund, may designate a representative for the purpose of receiving a due diligence notice; however, you are not required to designate a representative. If you add a designated representative, you acknowledge that:

- Fidelity is required to mail written notice to the representative, in addition to mailing the notice to the owner, upon presumption of abandonment of the account.
- The designated representative does not have any rights to the mutual fund shares and may not access the shares.

The process by which you select a designated representative is done through a written form, which may be accessed online or requested by phone.

## Residents of Minnesota

For Minnesota residents, as required by Minnesota Regulations 2790.0550, you are entitled to certain disclosures regarding the products or services that Fidelity representatives are authorized to offer or sell. These disclosures are available at https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/noindex/Minnesota-Regulatory-Legal-Disclosure.pdf. By signing the account application, you agree that you have read and understand such disclosures.

## Wisconsin Marital Property Act

Married Wisconsin residents should be aware that no provision of any marital property agreement, unilateral agreement, or court decree under Wisconsin's Marital Property Act will adversely affect a creditor's interest unless, prior to the time credit is granted, the creditor is furnished a copy of, or given complete information about, that agreement or decree.

## Residing Outside the United States

If we determine that you reside outside the United States, you will be subject to certain limitations. While we generally make this determination by looking at the address information on our books and records (including the addresses maintained by the account owner and certain individuals with control over the account), we reserve the right to consider other information when making this determination and/or subjecting you to these limitations.

Generally speaking, regardless of where you reside, you will be subject to certain limitations. These include, but are not limited to, the following: (i) we will provide you with only ministerial or administrative services, which means that, among other things, our representatives will not engage in discussions with you about such topics as asset allocation, income planning, or portfolio composition; and (ii) you will not be permitted to purchase additional shares of any U.S. mutual fund (except pursuant to a dividend reinvestment program or in other limited circumstances), which among other things will affect the operation of your core account (please refer to the Core Account section of this Agreement for further details).

In addition to the foregoing, depending on where you reside, you may be subject to additional restrictions (for example, margin lending or options trading may not be permitted) up to and including restrictions that will prevent you from making additional deposits or purchasing additional securities positions (i.e., you will be prohibited from doing anything in your account other than selling your existing holdings and withdrawing the proceeds).

Notwithstanding the above, special rules govern your relationship with us if you live in Canada. Because of this, and because every situation is unique, you should contact Fidelity if you have questions about how you may be affected.

If you notify us that you do not reside outside the U.S., these limitations may be lifted.

## Unclaimed Property

Your account balance and certain uncashed checks issued from your account may be transferred to a state unclaimed property administrator if no activity occurs in the account or the check remains outstanding within the time period specified by the applicable state law.

## Redemption Features/Callable Securities Lottery

Certain debt securities may have redemption features in addition to those disclosed on the trade confirmation including, for example, special mandatory redemption features such as sinking funds provisions. It is the customer's obligation to review all disclosure documents the customer may receive, and to understand the risks of calls or early redemptions, which may affect yield. Issuers may, from time to time, publish notices of offers to redeem callable securities within limited time, price, and tender parameters. NFS is not obligated to notify customers of such published calls. Information about whether a municipal security is callable can be accessed via the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA") website (www.emma.msrb.org).

When street name or bearer securities held for you are subject to a partial call or partial redemption by the issuer, NFS may or may not receive an allocation of called/redeemed securities by the issuer, transfer agent, and/or depository. If NFS is allocated a portion of the called/redeemed securities, NFS utilizes an impartial lottery allocation system, in accordance with applicable rules, that randomly selects the securities within customer accounts that will be called/redeemed. NFS's allocations are not made on a pro rata basis and it is possible for you to receive a full or partial allocation, or no allocation. You have the right to withdraw uncalled fully paid securities at any time prior to the cutoff date and time established by the issuer, transfer agent, and/or depository with respect to the partial call, and also to withdraw excess margin securities, provided your account is not subject to restriction under the Federal Reserve's Regulation T or such withdrawal will not cause an undermargined condition. If you have bought or sold a security, and prior to the settlement of your trade, the issuer initiates a call of the security, NFS reserves the right to cancel your trade. Customers are responsible for covering any outstanding short positions, as well as any other resulting costs in their account, that result from the lottery. For more information and an example of the impartial lottery process, please go to: http://personal.fidelity.com/products/fixedincome/FI_Common_Risk.shtml.

## FINRA BrokerCheck

As part of the Financial Industry Regulatory Authority (FINRA) BrokerCheck program, you have access to the FINRA BrokerCheck hotline at 800-289-9999 and the FINRA website at finra.org. You can call or email your inquiries and request a brochure that includes information detailing the BrokerCheck program.

## MSRB Investor Brochure

Fidelity Brokerage Services LLC is registered with the U.S. Securities and Exchange Commission (SEC) and the Municipal Securities Rulemaking Board (MSRB). An investor brochure may be obtained at msrb.org that describes the protections that may be provided by the MSRB and how to file a complaint with an appropriate regulatory authority.

## Resolving Disputes — Arbitration

This Agreement contains a predispute arbitration clause. Under this clause, which you agree to when you sign your account application, you and Fidelity agree as follows:

**A.** All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

**B.** Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

**C.** The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.

**D.** The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.

**E.** The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.

**F.** The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

**G.** The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.

**All controversies that may arise between you and us concerning any subject matter, issue, or circumstance whatsoever (including, but not limited to, controversies concerning any account, order, distribution, rollover, advice interaction, or transaction, or the continuation, performance, interpretation, or breach of this or any other agreement between you and us, whether entered into or arising before, on, or after the date this account is opened) shall be determined by arbitration through the Financial Industry Regulatory Authority (FINRA) or any United States securities self-regulatory organization or United States securities exchange of which the person, entity, or entities against whom the claim is made is a member, as you may designate. If you commence arbitration through a United States self-regulatory organization or United States securities exchange and the rules of that organization or exchange fail to be applied for any reason, then you shall commence arbitration with any other United States securities self-regulatory organization or United States securities exchange of which the person, entity, or entities against whom the claim is made is a member. If you do not notify us in writing of your designation within five (5) days after such failure or after you receive from us a written demand for arbitration, then you authorize us to make such designation on your behalf. The commencement of arbitration through a particular self-regulatory organization or securities exchange is not integral to the underlying agreement to arbitrate. You understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.**

**No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class action who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

Fidelity INVESTMENTS


© 2025 FMR LLC. All rights reserved.